ORIGINAL

FILED
JUL 25 2005
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**HUBERT BASFORD,**
**ROXANNE BASFORD, AND**
**BEAR MOUNTAIN CONTRACTING**

**v.**

**No.** 05 - 781C

**THE UNITED STATES**

# COMPLAINT

Come now the Plaintiffs, Hubert Basford, Roxanne Basford, and Bear Mountain Contracting, and complain against the Defendant as follows:

1. Plaintiffs Hubert Basford, and Roxanne Basford are individuals living in Laclede, Idaho. Basfords own and operate Plaintiff Bear Mountain Contracting. Jointly, the Plaintiffs are a "contractor".

2. Defendant is the United States, on behalf of the U.S. Department of Agriculture, on behalf of the U.S. Forest Service, Kootenai National Forest, located in Northwestern corner of Montana and the Northeastern corner of Idaho, on the Canadian border.

3. This is a claim against the United States founded upon an express contract with the United States for liquidated and unliquidated damages which case is subject to the Contract Disputes Act of 1978.

4. Plaintiffs have submitted their claims to the contracting officer in writing for a decision and the contracting office has issued his final decision on those claims.

5. This Court has jurisdiction of this matter pursuant to 28 U.S.C.A. § 1346 and 41 U.S.C.A. §609.

6. On or about July 1, 2003, U.S. District Judge Donald Molloy, in a case entitled *The Ecology Center v. Castenada*, Case No. CV-02-200-M-DWM, issued an injunction.

7. Plaintiffs, Idaho residents who were not involved in *The Ecology Center* case, were unaware of Judge Molloy's injunction on logging in the Kootenai National Forest.

8. On or about August 19, 2003, only 39 days after Judge Molloy's injunction, Defendant issued a 39 page Request for Quotation ("RFQ"), Number RFQ 14-03-085 for "Rexford Ranger District Fuel Reduction Thinning, Rexford Ranger District" ("the Contract"), which project was located within the boundaries of the Kootenai National Forest.

9. The Contract provided for two separate "Item Numbers" or areas of work covering 139 acres in the two project areas. Project 1 consisted of 1 item, "Black Butte Fuel Reduction" (98 acres); Project 2 consisted of one item, "Othorp Lake Fuel Reduction" (41 acres).

10. The first Item, "Black Butte" was described by the RFQ as "Selective tree thinning, removal of merchantable material, slashing, slash piling in unit".

11. The Second Item number, "Orthorp Lake" was described as Selective tree thinning, slashing, slash piling in unit, hand piling on steep slopes."

12. The Contract provided for, inter alia:

"Commercial Thinning"

Harvest/slash all stems in unit less than 8" DBH.
Leave all PP and WL 14" DBH and largercut and slash timber.
For a radius of 20 feet (outside bark) from each 14" DBH + PP or WL, *harvest all stems except 14" DBH + PP and WL.*
In areas where leaving the trees above would not result in at least 70 trees/acre, leave the largest most vigorous trees up to 70 trees/acre, giving WL and PP a priority over DF, but giving size and vigor criteria a higher precedence than species preference.
Leave 2-4 sound snags over 10" DBH where available.
Leave all other stems over 8" DBH.

"Slashing"
Slash all stems not designated for retention.

"Fuels Treatment (contractor)
*Excavator pile* thinning slash, and other activity and ground fuels.

13. Removal of merchantable material, harvesting, and commercial thinning as terms of the Contract all indicate the Defendant's inclusion of logging in the Plaintiffs' service contract, despite the Contract's designation of "fuel reduction thinning". The Contract solicited bids for work which included logging activity in the Rexford

Ranger District, located within the boundaries of the Kootenai National Forest, in violation of Judge Molloy's Injunction.

14. Plaintiffs bid on the Contract to perform the indicated work on Item 1, "Black Butte" for the amount of $22,050.00 and $10,975.00 for Item 2, "Othorp Lake", for a total bid price of $33,025.00.

15. Although the Contract was issued as a "service contract", under the terms of the Contract, the contractor performing the work was entitled to all retain merchantable timber and all salvage material, "down to the boughs".

16. The merchantable timber and salvage rights provisions of the Contract allowed the Plaintiff to bid the hundreds of hours of required labor, equipment use, and related costs and expenses for a price of only $33,025.00, because the Contract was intentionally structured to allow the contractor to supplement its income from the Contract bid price with income from the sale of the merchantable timber and salvage material obtained from the Contract.

17. In calculating their bid amount of $33,025.00, Plaintiffs anticipated receiving approximately $125,000.00 in additional revenue from the sale of the merchantable timber and salvage material, less their expenses.

18. On or about October 14, 2003, Defendant, through its representative and contracting officer Jeanne Robertson, issued Purchase Order, Number 43-03J1-4-0008 to Plaintiffs for $22,050.00 for Item 1 (Black Butte) and $10,975.00 for Item 2 (Othorp Lake) awarding Plaintiffs the Contract for a total price of $33,025.00.

19. On October 22, 2003, Plaintiff and the Defendant, through its representatives and contracting officers, Sheila Braum and Dale Reckley, attended a pre-work meeting to discuss the terms of the Contract.

20. At the pre-work meeting, the parties agreed to calculate and make payments to Plaintiff on a "per acre" basis as work was completed.

21. At the pre-work meeting, Defendant's agent, Sheila Braum told Plaintiffs that although they could post "trucks" signs warning drivers of the Plaintiff's logging trucks on the area roads, they were not to post any "logging trucks" signs on the roads near the Contract site.

22. On or about October 22, 2003, Plaintiff began performance under the Contract.

23. Between October 22, 2003, and March 3, 2004, Plaintiff slashed 44 acres of the total 98 acres of timber on the Black Butte area.

24. Plaintiff had hauled a portion of that slashed timber and placed it in a log deck for transfer to the local mill. Much of the slashed timber remained on the ground where it was cut, and unpiled.

25. On or about March 3, 2004, with no explanation, Defendant ordered Plaintiffs to suspend all work on the contract pursuant to 52.242-014.

26. On or about March 3, 2004, Plaintiff stopped work on the Black Butte portion of the Contract.

27. Losing money because of the delay, and unsure of its reason or length, Plaintiff asked Defendant why it had suspended work on the Contract, and when Plaintiff would be permitted to re-start performance.

28. On March 6, 2004, Defendant, through its agent and contracting officer, Dale Reckley, modified the terms of Item 2, the Black Butte portion of the Contract and ordered Plaintiff to re-start work on that portion of the Contract.

29. Contracting Officer Reckley's modifications to Item 2 included the following:

"No timber may be removed from Black Butte.
44 acres that have been slashed shall be piled.
Contractor shall submit in writing a new price for Item 1, Black Butte.
Total price shall include separate sub-item prices for hand piling and excavator piling existing slash.
No changes are made to Ortho Lake."

30. Although Plaintiffs had completed a substantial portion of the work on the Black Butte portion of the Contract, the Defendant prohibited Plaintiffs from removing any of the saw logs which had been stacked "in deck" for transmittal to the mill.

31. Defendant's changes to the Contract materially *increased* Plaintiffs' work description by requiring hand-piling of material originally bid to be excavator-piled, while materially *decreasing* Plaintiffs' compensation for that work by prohibiting them from removing any of the timber and recovering the majority of their compensation under the Contract.

32. On March 13, 2004, Plaintiffs responded to Mr. Reckley's contract modification indicating that because they were no longer allowed to remove timber from the

job site, Plaintiffs required payment for 1) all the salvage and timber to which they had previously been entitled in the Black Butte Area; 2) all their expenses incurred because of the suspension; and 3) the difference between the original Contract compensation terms and the modified Contract compensation terms.

33. In response to Plaintiff's request for compensation for Defendant's modification of the Contract, on April 6, 2004, Defendant, through its agent and contracting officer Dale Reckley, again modified the Contract, this time by terminating Item 2, the Black Butte portion of the Contract in its entirety.

34. Explaining to Defendant that subsequent to Defendant's modification to the Contract, it was no longer feasible for Plaintiffs to complete the Contract, as modified, Plaintiffs requested the Defendant pay them the amount of $24,525.00 which remained unpaid on the Contract, plus payment for the value of all the merchantable timber and salvage rights on the 98 acres of the Black Butte portion of the Contract due to Defendant's error in issuing the Contract in violation of Judge Molloy's injunction.

35. Defendant, through its agent and contracting officer Reckley, agreed to pay Plaintiff $4,400.00 on an invoice Plaintiff had previously submitted for completed work on the Black Butte site and offered to review Plaintiff's information regarding the value of the salvage material at the site. Plaintiffs were never paid for this completed work.

36. Despite his extensive and material modification to the terms of the Contract, with no change in compensation to Plaintiffs, or increase in time for performance, Reckley ordered Plaintiffs to continue work on the remaining portion of the Contract (Item 1, Othorp lake).

37. Plaintiffs responded as requested by Reckley and completed work on Item 1, the Othorp Lake portion of the Contract.

38. On or about April 20, 2004 Defendant, through its agent and contracting officer Reckley, requested data from the Plaintiff supporting the value of the timber and salvage for the completed area of the Black Butte portion of the Contract.

39. Despite Reckley's offer to review Plaintiff's information regarding the value of the salvage material on the Black Butte portion of the Contract, Defendant has never compensated Plaintiffs for the any of the merchantable timber remaining at the site.

40. On our about April 26, 2004 Plaintiffs requested the Defendant to address the

value of the timber and salvage on the entire 98 acres (both completed and uncompleted) which they have lost due to Defendant's modifications.

41. On or about May 5, 2004, the Plaintiffs indicated to Defendant that the value of the salvage on the Black Butte portion of the Contract is approximately $71,874.00 for saw logs, $14,112.00 for pulp. Plaintiffs indicate an amount for Item 1, Othorp Lake, is $250 per acre for Excavator Piling, $600.00 per acre for hand piling.

42. On our about May 14, 2004, Plaintiffs requested Defendant issue them an extension of three (3) months from July 31 to October 31 for completion of the Contract due to the undecided standing of the Contract. Plaintiffs indicate the Contract extension is required to give them the time to complete the work.

43. On or about May 18, 2004, the Defendant, through its agent and contracting officer Reckley, denies Plaintiff's request for additional time to complete the Contract.

44. Reckley also tells Plaintiffs he will not adjust the Contract price, despite the work suspension, the material increases to the amount of and material changes in the character of work required by now requiring Plaintiff to "hand-pile" material which was previously bid as an "excavator-pile" job, and the elimination of the majority of Plaintiffs' compensation under the Contract.

45. On or about May 21, 2004 Plaintiffs request additional compensation from Forest Supervisor Bob Castenada due to contracting officer Reckley's refusal to adjust the Contract price in relation to the increased work requirement and cost for hand-piling the slash material.

46. On or about June 3, 2004, the Defendant, by and through its agent, Dale J. Fabian, Director, Acquisition Management, notified the Plaintiffs that the Forest Service has calculated the estimated market value of the downed timber based on cruised volume, and contracting officer Reckley has agreed to make payment to Basfords in that amount for the efforts they have made.

47. On or about June 8, 2004, Reckley requests Plaintiffs to "fill in the values for work to be completed" on the Black Butte portion of the Contract.

48. On or about June 29, 2004, Plaintiffs provide Reckley with the figure of $71,874.00 in work to be completed.

49. On or about July 6, 2004, after Reckley tells Plaintiffs the contract was "bid at a

price and must be done at that price", the Plaintiffs request the Defendant to provide them with a new Contracting Officer.

50. To date, despite numerous assurances from Defendant, Plaintiffs have never been paid *any* amount for work they have completed on the Black Butte portion of the Contract, for their lost compensation due to Defendant's modification of the Contract, or for any other purpose.

51. On or about July 26, 2004, Defendant through its agent Reckley, defaulted Plaintiff on the Contract in its entirety for failure to perform as requested.

52. On or about August 20, 2004, Judge Molloy lifted injunction on logging in the Kootenai National Forest.

53. On August 30, 2004, the Defendant offered to reinstate the Contract "under the original terms and conditions", giving Plaintiff one (1) day to do so.

54. On August 31, 2004, Plaintiffs, through their attorneys, submitted their Settlement Proposal in response to Defendant's July 26, 2004 Notice of Termination and that Notice's request for Plaintiffs to submit the same.

55. Defendant's Settlement Proposal requested $51,832.00 for completed work and the value of merchantable materials to which they would have been entitled on the completed portion of the Black Butte Item of the Contract, plus reasonable associated costs to prepare the proposal. This figure did not include amounts to which Plaintiff would have been entitled had it been permitted to work through completion of the Contract. Plaintiff further indicated that any resolution must include Defendant's recission of Plaintiff's default on the Contract.

56. Plaintiff's Settlement Proposal was supported by substantial evidence, including the analysis and opinion of Dan Pittman, CF/ACF, a forestry and natural resources consultant, which was attached to the Proposal.

57. At no time did the Defendant ever request copies of supporting documentation relied upon by Plaintiffs, their attorneys, or their forestry consultant, although the same was readily available for Defendant's review.

58. On or about September 24, 2004, the Defendant, through contracting officer Reckley, issued its Final Decision on Salvage Value, Contract No. 43-03J1-4-008 finding that the Plaintiffs were entitled to $2,828.77, to be held in an account pending determination of excess costs associated with reprocurement of services.

59. Plaintiffs now appeal contracting officer Reckley's 1) termination of the Contract on July 26, 2004 and 2) his determination regarding the value of the salvage material on the Black Butte portion of the Contract.

***FIRST CLAIM FOR RELIEF***

**(Failure to make an equitable Adjustment for Work Suspension caused by Government)**

60. Plaintiff realleges and incorporates by reference the allegations of ¶¶ 1-59, inclusive.

61. The contracting officer suspended the Contract on the grounds of its counsel's opinion regarding Judge Molloy's injunction. The suspension was a government-caused delay.

62. The Defendant, through an act or failure of its contracting officer to act, in the administration of the Contract, suspended, delayed or interrupted Plaintiff's performance under the Contract for an unreasonable time.

63. Defendant's suspension of Plaintiff's performance of the Contract was unreasonable.

64. Plaintiff was on standby during the suspension and was unable to take on other work during the suspension period, causing Plaintiff economic damage.

65. The Contracting Officer's motivations and actions constitute bad faith.

66. The Defendant's unreasonable delay, suspension, or disruption of the Contract necessarily caused Plaintiffs an increase in the cost of the performance of the Contract.

67. Plaintiff is entitled to damages for its added expenses and damages arising out of the Government's suspension.

68. Defendant had a duty to adjust the Contract and to modify the Contract accordingly, for the increase in the cost of performance necessarily caused by the unreasonable delay, suspension, or disruption.

69. Defendant failed to make an adjustment to the Contract for the increase in the cost of performance to Plaintiffs necessarily caused by the Defendant's

unreasonable delay, suspension, or disruption.

70. Plaintiffs were entitled to an upward adjustment of the Contract price which would have enabled them to complete the Contract in its entirety.

71. Plaintiffs are now entitled to their economic damages as a result of the Government's suspension.

***SECOND CLAIM FOR RELIEF***
**(Failure to Grant Equitable Adjustment for Contract Change - hand-piling)**

72. Plaintiff realleges and incorporates by reference the allegations of ¶¶ 1-71, inclusive.

73. Defendant's directive to Plaintiffs, through its agent and contracting officer Reckley, to hand-pile salvage material on the Black Butte portion of the Contract, which was provided in the Contract to be piled by an excavator, constitutes either a directed change or a constructive change to the Contract.

74. Defendant's contracting officer Dale Reckley, failed to act conscientiously in the discharge of his duties in administering the Contract.

75. Defendant's change to the Contract caused a substantial and material increase in the cost of performance and an increase in the time required for performance of the work under the Contract.

76. The Contracting Officer's motivations and actions constitute bad faith.

77. Defendant had a duty to make an equitable adjustment in the Contract price, the time for completion, or both, and to modify the Contract to reflect such adjustment accordingly.

78. Defendant failed to make an equitable adjustment in the Contract price.

79. Plaintiff was entitled to an equitable adjustment in the Contract price to provide for the increased cost of hand-piling instead of excavator-piling of material.

80. Plaintiff is now entitled to its economic damages resulting from Defendant's failure to make the required equitable adjustment.

***THIRD CLAIM FOR RELIEF***
**(Failure to Grant Equitable Adjustment for Contract Change - elimination of**

**entitlement to timber and salvage)**

81. Plaintiff realleges and incorporates by reference the allegations of ¶¶ 1-80, inclusive.

82. Defendant's elimination of Plaintiff's entitlement to timber and salvage material from the Black Butte portion of the Contract constitutes either a directed change or a constructive change to the Contract.

83. Defendant's contracting officer Dale Reckley, failed to act conscientiously in the discharge of his duties in administering the Contract.

84. The Contracting Officer's motivations and actions constitute bad faith.

85. Defendant's change to the Contract caused a decrease in the compensation for the work performed under the Contract.

86. Defendant had a duty to make an equitable adjustment in the Contract price, the time for completion, or both, and to modify the Contract to reflect such adjustment accordingly.

87. Defendant failed to make an equitable adjustment in the Contract price.

88. Plaintiff was entitled to an equitable adjustment in the Contract price to reflect the Government's elimination of Plaintiffs' entitlement to timber and salvage materials on the Black Butte portion of the Contract.

89. Plaintiff is entitled to its damages resulting from Defendant's failure to make the necessary and required equitable adjustment to the Contract.

***ALTERNATIVE FOURTH CLAIM FOR RELIEF***
**(Breach of Contract--Cardinal Change – Hand Piling)**

90. Plaintiff realleges and incorporates by reference the allegations of ¶¶ 1-89 inclusive.

91. Defendant modified the Contract by requiring Plaintiffs to hand-pile material on the Black Butte portion of the Contract, which was provided in the Contract to be piled by an excavator.

92. The Contracting Officer's motivations and actions constitute bad faith.

93. Defendant's contracting officer Dale Reckley, failed to act conscientiously in the discharge of his duties in administering the Contract.

94. Defendant's modification was a "Cardinal Change" of the Contract terms so drastic that it effectively altered the work required of Plaintiffs that it required them to perform work materially different from those bargained for.

95. The Defendant's cardinal change was not redressible under the contract, and thus renders the government in breach of the contract.

96. Plaintiff is entitled to an award of damages, including lost profits, as a result of Defendant's cardinal change to the Black Butte Contract in an amount to be determined at trial, which includes but is not limited to: compensation for work performed by Plaintiffs on the Black Butte Contract but never paid for by Defendant; the amount Plaintiff was entitled to recover from the sale of timber and salvage from the Black Butte Contract, less expenses, but was prevented from receiving due to Defendant's breach of the Contract; the expense of shut-down and moving of their equipment to and from the job site due to Defendant's suspension of the Contract; losses resulting from the forced sale of equipment Plaintiffs had purchased solely for the purpose of performing under this Contract due to Defendant's Contract breach; Plaintiffs' lost business opportunity due to their inability to bid on other contracts or to perform other work after relying on Defendant's issuance of the Purchase Order and grant of the Contract to Plaintiffs, and a reasonable profit on these amounts.

## *ALTERNATIVE FIFTH CLAIM FOR RELIEF*
## (Breach of Contract--Cardinal Change – Elimination of Salvage Rights)

97. Plaintiff realleges and incorporates by reference the allegations of ¶¶ 1-98 inclusive.

98. Defendant modified the Contract by eliminating Plaintiffs' salvage rights on the Black Butte portion of the Contract.

99. Defendant's contracting officer Dale Reckley, failed to act conscientiously in the discharge of his duties in administering the Contract.

100. The Contracting Officer's motivations and actions constitute bad faith.

101. Defendant's modification was a "Cardinal Change" of the Contract terms so drastic that it effectively reduced Plaintiffs' compensation by approximately 80% when it eliminated Plaintiffs' right to sell timber and salvage material from the

Black Butte portion of the Contract.

102. Defendant's cardinal change was not redressible under the Contract, and thus renders the government in breach of the contract.

103. Plaintiff is entitled to an award of damages, including lost profits, as a result of Defendant's cardinal change to the Black Butte Contract in an amount to be proven at trial. This amount includes but is not limited to: compensation for work performed by Plaintiffs on the Black Butte Contract but never paid for by Defendant; the amount Plaintiff was entitled to recover from the sale of timber and salvage from the Black Butte Contract, less expenses, but was prevented from receiving due to Defendant's breach of the Contract; the expense of shut-down and moving of their equipment to and from the job site due to Defendant's suspension of the Contract; losses resulting from the forced sale of equipment Plaintiffs had purchased solely for the purpose of performing under this Contract due to Defendant's Contract breach; Plaintiffs' lost business opportunity due to their inability to bid on other contracts or to perform other work after relying on Defendant's issuance of the Purchase Order and grant of the Contract to Plaintiffs, and a reasonable profit on these amounts.

**ALTERNATIVE SIXTH CLAIM FOR RELIEF**
**(Settlement costs based upon a termination of the Black Butte Contract for the Convenience of the Government.)**

104. Plaintiff realleges and incorporates by reference the allegations of ¶¶ 1-103 inclusive.

105. The term for completion of the contract should have been tolled during the term of Judge Molloy's injunction the Molloy injunction.

106. Plaintiff requested an extension of time to perform under the contract due to the uncertainty and delay which resulted from Defendant's issuance of the Contract in violation of Judge Molloy's injunction.

107. The Defendant refused to allow Plaintiff a reasonable extension of time to perform under the Contract.

108. Defendant's contracting officer Dale Reckley, failed to act conscientiously in the discharge of his duties in administering the Contract.

109. The Contracting Officer's motivations and actions constitute bad faith.

110. The parties have been unable to settle their dispute through negotiation.

111. The contracting officer has made a unilateral decision with regard to Plaintiff's compensation under the terminated Contract.

112. Plaintiff is entitled to appeal the contracting officer's decision and to receive the reasonable value of his services plus a reasonable profit.

113. Defendant and its contracting officer's election to terminate the contract was in bad faith or was a clear abuse of discretion.

114. Plaintiff has been injured by Defendant's termination of the Contract.

115. Defendant's departure from termination procedures provided by the procurement regulations constitutes a breach of the Contract.

116. Plaintiff is entitled to compensation for the Government's termination of the Contract in an amount to be determined at trial.

***ALTERNATIVE SEVENTH CLAIM FOR RELIEF***
**(Claim for relief from an illegal contract)**

117. Plaintiff realleges and incorporates by reference the allegations of ¶¶ 1-116 inclusive.

118. Based on the facts alleged herein, the Contract, or a portion thereof, was illegal from its inception for its issuance in violation of Judge Molloy's injunction.

119. Defendant's contracting officer Dale Reckley, failed to act conscientiously in the discharge of his duties in administering the Contract.

120. The Contracting Officer's motivations and actions constitute bad faith.

121. This Court has the power to grant relief to Plaintiff when the express contract is illegal.

122. The illegality is not palpable, and Plaintiffs are entitled to recover under the express contract, or if palpable, Plaintiff is entitled to recover under an implied-in-fact contract.

WHEREFORE, Plaintiff certifies that these claims are made in good faith, that the supporting data are accurate and complete to the best of their knowledge and belief,

that the amounts requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor.

Plaintiffs therefore respectfully request the Court to enter its Order and Judgment in Plaintiff's favor determining the following:

A. Finding that Defendant's contracting officer Dale Reckley, failed to act conscientiously in the discharge of his duties in administering the Contract;

B. Finding that the Contracting Officer's motivations and actions constitute bad faith.

C. Reversing the contracting officer's July 26, 2004 Notice of Termination

D. Reversing the contracting officer's September 24, 2004, Final Decision on Salvage Value;

E. Determining Plaintiff's entitlement to compensation for the value of the timber and salvage material to which Plaintiff was entitled under the Contract;

F. Determining Plaintiff's entitlement to compensation for completed work under the Contract;

G. Determining Plaintiff's entitlement to compensation for the work which Plaintiff had contracted to complete, but was prevented from completing, under the Contract;

H. Finding that the Contracting Officer's action with respect to modification and termination of the Contract constituted a cardinal change and a breach of contract;

I. In the alternative, finding that the Contract was illegal from its inception, an that Plaintiff is entitled to recover under the express contract, or under an implied-in-fact contract.

J. Awarding Plaintiffs their damages, including, but not limited to lost profits, incurred as a result of the Government's breach.

K. Awarding Plaintiffs their costs and attorneys' fees incurred in connection

with this claim;

L. Awarding Plaintiffs interest on their claims through the date of payment of their claims.

Respectfully submitted this 22 day of July, 2005.

Andrew W. Pierce
Sullivan, Tabaracci & Rhoades, P.C.
1821 South Ave. W.- 3rd Floor
Missoula, Montana 59801
406.721.6299 phone
406.721.5838 facsimile

# REQUEST FOR QUOTATION
*(THIS IS NOT AN ORDER)*

THIS RFQ ☒ IS ☐ IS NOT A SMALL BUSINESS SET-ASIDE

PAGE OF PAGES: 1 | 39

| 1. REQUEST NO. | 2. DATE ISSUED | 3. REQUISITION/PURCHASE REQUEST NO. | 4. CERT FOR NAT. DEF. UNDER BDSA REG. 2 AND/OR DMS REG. 1 | RATING |
|---|---|---|---|---|
| **RFQ 14-03-085** | **August 19, 2003** | | | |

5a. ISSUED BY

**USDA, Forest Service**
**Kootenai National Forest**
**1101 U.S. Highway 2 West**
**Libby, MT 59923**

6. DELIVER BY *(Date)*

**Estimated Start Date: See page 21**
**Contract Time: See page 21**

5b. FOR INFORMATION CALL *(NO COLLECT CALLS)*

| NAME | AREA CODE | NUMBER |
|---|---|---|
| **Dale Reckley, Contractual** | 406 | 283-7644 |
| **Sheila Braun, Technical** | 406 | 296-7164 |

7. DELIVERY ☐ FOB DESTINATION ☐ OTHER *(See Schedule)*

8. TO:

a. NAME | b. COMPANY
c. STREET ADDRESS
d. CITY | e. STATE | f. ZIP CODE

9. DESTINATION

a. NAME OF CONSIGNEE
b. STREET ADDRESS
c. CITY
d. STATE | e. ZIP CODE

10. PLEASE FURNISH QUOTATIONS TO THE ISSUING OFFICE IN BLOCK 5A ON OR BEFORE CLOSE OF BUSINESS *(Date)*

**September 2, 2003**

**IMPORTANT:** This is a request for information, and quotations furnished are not offers. If you are unable to quote, please so indicate on this form and return it to the address in Block 5A. This request does not commit the Government to pay any costs incurred in the preparation of the submission of this quotation or to contract for supplies or services. Supplies are of domestic origin unless otherwise indicated by quoter. Any representations and/or certifications attached to this Request for Quotations must be completed by the quoter.

## 11. SCHEDULE *(Include applicable Federal, State and local taxes)*

| ITEM NO. (a) | SUPPLIES/SERVICES (b) | QUANTITY (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) |
|---|---|---|---|---|---|
| | **Rexford Ranger District Fuel Reduction Thinning**<br>**Rexford Ranger District**<br><br>**Furnishing Quotation**: Complete the short package of this Request for Quotations as your quote. It contains the Standard Form 18 through **Page No. 11**. Return to the contracting officer at the address shown in Block 5A.<br><br>Award will be made under Simplified Acquisition Procedures, limited to $100,000 or less.<br><br>**QUOTATIONS WILL BE KEPT CONFIDENTIAL UNTIL AWARD IS MADE.** | | | | **Enter Prices on Page 2.** |

| 12. DISCOUNT FOR PROMPT PAYMENT | a. 10 CALENDAR DAYS (%) | b. 20 CALENDAR DAYS (%) | c. 30 CALENDAR DAYS (%) | d. CALENDAR DAYS NUMBER | PERCENTAGE |
|---|---|---|---|---|---|
| | XXXXXXXXXXXX | | | | |

**NOTE:** Additional provisions and representations ☒ are ☐ are not attached.

13. NAME AND ADDRESS OF QUOTER

a. NAME OF QUOTER
**DUNS #**
b. STREET ADDRESS
c. COUNTY
d. CITY | e. STATE | f. ZIP

14. SIGNATURE OF PERSON AUTHORIZED TO SIGN QUOTATION

15. DATE OF QUOTATION

16. SIGNER

a. NAME *(Type or Print)*
b. TELEPHONE AREA CODE
...nt)
NUMBER

EXHIBIT
A
tabbies

# Rexford Ranger District Fuel Reduction Thinning

Kootenai National Forest
Rexford Ranger District
Lincoln County, Montana

## SCHEDULE OF ITEMS

| Item No | Description | Unit | Estimated Quantity | Total Price |
|---|---|---|---|---|
| 1 Black Butte | Selective tree thinning, removal of merchantable material, slashing, slash piling in unit | pile 125.00 ac<br>thin 100.00 ac<br>Lump Sum | 1 | $ 22,050.00 |
| 2 Othorp Lake | Selective tree thinning, slashing, slash piling in unit. hand piling on steep slopes | pile 125.00 ac<br>thin 100.00 ac<br>Handpile 250.00 ac<br>Lump Sum | 1 | $ 10,975.00 |
| | | | **TOTAL PRICE** | $ 33,025.00 |

**BASIS OF AWARD**: **AWARD WILL BE MADE BY ITEM. QUOTES WILL NOT BE ACCEPTED FOR ANY QUANTITIES LESS THAN THOSE SPECIFIED, AND MUST BE SUBMITTED FOR ALL SUBITEMS WITHIN AN ITEM.**

**EVALUATION OF QUOTES**: The Government may issue an order as a result of this Request for Quotations to the responsible quoter whose quote conforming to the solicitation will be most advantageous to the Government. Award will be made on a Best Value basis considering past performance, experience, capability, capacity, price, and overall cost to the Government.

The Government may issue an order to other than the lowest quoter, waive minor informalities or irregularities in quotes received, or elect to not award at all. If necessary, the Government may conduct discussions with any or all quoters.

**INCIDENTAL PAYMENT ITEMS**: The intent of the contract is to provide for the complete construction of the project described in the contract. Unless otherwise provided, the Contractor shall furnish all labor, materials, equipment, tools, transportation, and supplies and perform all work required to complete the project in accordance with the drawings, specifications, and provisions of the contract. Payment for contract work will be made for and under those pay items included in the Schedule of Items. All other work and materials will be considered as incidental to and included in the payment for items shown.

## EXPERIENCE QUESTIONNAIRE

**Slash Piling**
**Rexford Ranger District**

(1) How many years have you been a prime contractor? ________________

(2) **Record of Past Performance**. List below all slash piling **or** similar projects your business has completed within the last three (3) years:

| Contract Amount | Type of Project | Size | Date Completed | Contract Completed on Time? | Name of Forest or Company, Contracting Officer & Telephone No. |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

(3) Have you ever failed to complete any work awarded to you (Yes or No)? ________________

If yes, list the date, location, and COR (Contracting Officer's Representative) where the default occurred. ______________________________________
______________________________________
______________________________________
______________________________________

(4) **Capacity**. List below all of your firm's contractual commitments running concurrently with the work contemplated by this Request for Quotation:

**CONTINUATION OF SF-18**
**REPRESENTATIONS CERTIFICATIONS AND PROVISIONS**
**(SUPPLY/SERVICES)**

**FAR 52.219-1 SMALL BUSINESS PROGRAM REPRESENTATIONS (APR 2002)**

(a) (1) The North American Industry Classification (NAICS) code for this acquisition is
.

(2) The small business size standard is ___________.

(3) The small business size standard for a concern which submits an offer in its own name, other than on a construction or service contract, but which proposes to furnish a product which it did not itself manufacture, is 500 employees.

(b) **Representations**

(1) The offeror represents and certifies as part of its offer that it ❑ is, ❑, is not a small business concern.

(2) [*Complete only if the offeror represented itself as a small business concern in paragraph (b)(1) of this provision.*] The offeror represents, for general statistical purposes, that it ❑ is, ❑ is not a small disadvantaged business concern as defined in 13 CFR 124.1002.

(3) [*Complete only if the offeror represented itself as a small business concern in paragraph (b)(1) of this provision.*] The offeror represents as part of its offer that it ❑ is, ❑ is not a women-owned small business concern.

(4) [*Complete only if the offeror represented itself as a small business concern in paragraph (b)(1) of this provision.*] The offeror represents as part of its offer that it ❑ is, ❑ is not a veteran-owned small business concern.

(5) [*Complete only if the offeror represented itself as a veteran-owned small business concern in paragraph (b)(4) of this provision.*] The offeror represents as part of its offer that it ❑ is, ❑ is not a service-disabled veteran-owned small business concern.

(6) [*Complete only if the offeror represented itself as a small business concern in paragraph (b)(1) of this provision.*] The offeror represents, as part of its offer, that-

(i) It ❑ is, ❑ is not a HUBZone small business concern listed, on the date of this representation, on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration, and no material change in ownership and control, principal office, or HUBZone employee percentage has occurred since it was certified by the Small Business Administration in accordance with 13 CFR part 126; and

(2) Whose management and daily business operations are controlled by one or more women.

(d) **Notice**

(1) If this solicitation is for supplies and has been set aside, in whole or in part, for small business concerns, then the clause in this solicitation providing notice of the set-aside contains restrictions on the source of the end items to be furnished.

(2) Under 15 U.S.C. 645(d), any person who misrepresents a firm's status as a small, HUBZone small, small disadvantaged, or women-owned small business concern in order to obtain a contract to be awarded under the preference programs established pursuant to sections 8(a), 8(d), 9, or 15 of the Small Business Act or any other provisions of Federal law that specifically references section 8(d) for a definition of program eligibility, shall--

(i) Be punished by imposition of fine, imprisonment, or both;

(ii) Be subject to administrative remedies, including suspension and debarment; and

(iii) Be ineligible for participation in programs conducted under the authority of the Act.

**FAR 52.204-3 TAXPAYER IDENTIFICATION (OCT 1998)**

(a) **Definitions**

"Common parent," as used in this provision, means that corporate entity that owns or controls an affiliated group of corporations that files its Federal income tax returns on a consolidated basis, and of which the offeror is a member.

"Taxpayer Identification Number (TIN)," as used in this provision, means the number required by the Internal Revenue Service (IRS) to be used by the offeror in reporting income tax and other returns. The TIN may be either a Social Security Number or an Employer Identification Number.

(b) All offerors must submit the information required in paragraphs (d) through (f) of this provision to comply with debt collection requirements of 31 U.S.C. 7701(c), and 3325 (d), reporting requirements of 26 U.S.C. 6041, 6041A, and 6050M, and implementing regulations issued by the IRS. If the resulting contract is subject to the payment reporting requirements described in Federal Acquisition Regulation (FAR) 4.904, the failure or refusal by the offeror to furnish the information may result in a 31 percent reduction of payments otherwise due under the contract.

(c) The TIN may be used by the government to collect and report on any delinquent amounts arising out of the offeror's relationship with the Government (31 U.S.C. 7701(c)(3)). If the resulting contract is subject to the payment reporting requirements described in FAR 4.904, the TIN provided hereunder may be matched with IRS records to verify the accuracy of the

TIN________________________________

**APPLICABLE TO CONTRACTS FOR PREDOMINANTLY MANUAL FORESTRY WORK:**

**MIGRANT AND SEASONAL AGRICULTURAL WORKER PROTECTION ACT REGISTRATION**

(a) In compliance with the Migrant Seasonal and Agricultural Worker Protection Act (MSPA) (29 USC 1801-1872; 5 CFR 500), the offeror certifies that he/she:

❑ Has been issued MSPA Registration Number________________________.

❑ Has applied for a MSPA Registration Number.

❑ Has not applied for a number.

❑ Is not required to register because the offeror does not employ anyone other than immediate family members. (Parents, children, brothers and sisters)

(b) Any employer who hires or anticipates hiring employees subject to MSPA and who anticipates bidding on a federal contract now or in the future must submit an application to obtain a registration number.

(c) Application for a registration number should be made on Form WH-510 which is available at State Employment Offices. Questions concerning application should be directed to the State Employment Office or the U.S. Department of Labor. Completed forms should be mailed to the appropriate U.S. Department of Labor Regional Office.

(d) A valid U.S. Department of Labor Registration Number must be supplied to the Contracting Officer prior to issuance of a "Notice to Proceed" with the work. Failure to provide such number within _____ days of award is grounds for termination of the contract.

APPLICABLE TO CONTRACTS FOR SUPPLIES OR SERVICES INVOLVING FURNISHING OF SUPPLIES:

**FAR 52.225-2 BUY AMERICAN ACT CERTIFICATE (JUN 2003)**

(a) The offeror certifies that each end product, except those listed in paragraph (b) of this provision, is a domestic end product and that the offeror has considered components of unknown origin to have been mined, produced, or manufactured outside the United States. The offeror shall list as foreign end products those end products manufactured in the United States that do not qualify as domestic end products. The terms "component," "domestic end product," "end product," "foreign end product," and "United States" are defined in the clause of this solicitation entitled "Buy American Act—Supplies."

(b) **Foreign End Products**:

provide the following information:

(1) Company name.

(2) Company address.

(3) Company telephone number.

(4) Line of business.

(5) Chief executive officer/key manager.

(6) Date the company was started.

(7) Number of people employed by the company.

(8) Company affiliation.

(c) Offerors located outside the United States may obtain the location and phone number of the local Dun and Bradstreet Information Services office from the Internet home page at http://www.customerservice@dnb.com. If an offeror is unable to locate a local service center, it may send an e-mail to Dun and Bradstreet at globalinfo@mail.dnb.com.

**FAR 52.222-38 COMPLIANCE WITH VETERANS' EMPLOYMENT REPORTING REQUIREMENTS (DEC 2001)**

By submission of its offer, the offeror represents that, if it is subject to the reporting requirements of 38 U.S.C. 4212(d) (i.e., if it has any contract containing Federal Acquisition Regulation clause 52.222-37, Employment Reports on Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans), it has submitted the most recent VETS-100 Report required by that clause.

***NOTE***: *Offerors should address questions concerning VETS-100 reporting and reporting requirements to the Office of Veterans Employment and Training Services offices at the following address:*

*U.S. Department of Labor*
*VETS-100 Reporting*
*6101 Stevenson Avenue*
*Alexandria, VA 22304-3540*
*Telephone: (703) 461-2460*
E-mail: *VETS100@dyncorp.com*
Website: *www.vets100.cudenver.edu*

# DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

## GENERAL

**Scope Of Contract.** The purpose of this contract is to secure a complete set of services to accomplish stand treatments that have historically been accomplished by numerous individual contracts. In the past, contracts have been awarded for fuel reduction and precommercial thinning; each of these were designed to meet management objectives for a range of resources. The purpose of this contract is to secure a combination of these operations into one contract to take advantage of the efficiencies of having one larger contract to meet multiple objectives. By the selective slashing of the conifer regeneration to reduce vegetation competition in the understory. This treatment will also open the overstory canopy. Specifically, the reduction of existing fuels through tree thinning. The contractor shall, considering given sets of resource objectives for each unit, develop a plan of operations to accomplish these objectives, and organize and direct all of the equipment and personnel needed to fully accomplish the work. The Contractor shall furnish all technical expertise, labor, equipment, supervision, transportation, operating supplies, and incidentals necessary to complete the work required.

The desired end result of this project is to achieve the following:

1. Reduce intensities of future wildfires and resulting damages to natural resources and other improvements within the wild land/urban interface through slashing, lopping, piling and prescribed burning.

2. Improve wildlife habitat by removing the dense overstory to encourage the growth of vegetative browse in big game winter range as well as improving thermal cover,

3. Reduce ladder and surface fuels, thereby reducing the susceptibility of the forest to losses caused by wildfire,

4. Open gaps in the canopy and retain the largest trees, thereby restoring fire resiliency in stands located in high risk fire areas,

5. Reduce impacts from smoke pollutants by utilizing mechanical methods for treating fuels where feasible.

6. Move units towards a fire-maintained park-like, light fuel load state with both long and short–term desirable visual quality conditions.

7. Reduce forest and stand susceptibility to future outbreaks of insects and diseases.

The environmental documentation for this project is available for review at the Eureka Ranger Station in Eureka, Montana.

**Location And Description**. This contract contains 139 acres in two project areas.

1) Project 1 consist of 1 item, Black Butte Fuel Reduction (98 acres), T36N, R28W, section 24
2) Project 2 consists of 1 item, Orthrop Lake Fuel Reduction (41 acres), T36N, R27W, section 28.

See vicinity and project maps in appendix. District travel maps are available at the Eureka Ranger station office at no charge.

The project areas consists of forested stands dominated by slopes generally less than 30 percent slopes.

The boundaries of the project areas are shown on the attached project map, which is made part of this contract. All project map detail indicating location is approximate; therefore, actual locations, as the Forest Service has designated on the ground, take precedence over the project map. Exterior boundaries of all units are marked in the field with flagging.

Silvicultural Prescriptions are included in this solicitation. Additional information can be obtained by contacting Ellery Steward at the Rexford Ranger District, telephone (406) 296-7127, during business hours.

## TECHNICAL SPECIFICATIONS

**Selection of Leave Trees**. Selected leave trees shall be the best formed, most vigorous, least damaged, (due to insects, disease, Physical, or mechanical causes), and be within the species preference guidelines.

Indicators of desirable trees are:

Straight stem
Small branch diameter
Good coloration
Well-formed crown
Branches horizontal to bole
Free of insects and disease

These indicators, as well as overall tree vigor shall be important criteria for leave tree selection. The most prominent indicator for vigor is annual terminal growth for the last three years.

Indicators of undesirable trees are:

Multiple tops
Poor crown form

The amount of the final payment will be calculated as described above and approved for payment after--

Completion and acceptance of all work;

Presentation of a properly executed invoice; and

Presentation of release of all claims against the Government arising by virtue of this contract, other than claims, in stated amounts, that the Contractor has specifically excepted from the operation of the release. A release may also be required of the assignee if the Contractor's claim to amounts payable under this contract has been assigned under the Assignment of Claims Act of 1940 (31 U.S.C. 3727 and 41 U.S.C. 15).

## SILVICULTURAL PRESCRIPTION FUNDING SUMMARY

| | | |
|---|---|---|
| PROJECT NAME/UNIT #: Orthrop Lake | | ACRES: |
| STAND ID: | TREATMENT: pre Commercial Thinning, | |
| PREPARED BY: Joseph lewicki | DATE:1/19/2001 | |

| ACTION: | ACTIVITY CODE | TIME LINE | YEAR | FUND UNITS | KV CODE | PROTECT? | NOTES: |
|---|---|---|---|---|---|---|---|
| Prescription | 4334 | 0 | | AC | 37 | | |
| Pre-Commercial thinning | 4521 | 0 | | AC | 12 | | Precommercial thin by harvesting all stems less than 7" DBH |
| Fuels Treatment | 4983 | 0 | | 90% AC\ | 15 | No | Pile thinning slash, and other activity and ground fuels. (90% of area) (contractor). |
| Fuels treatment | 4986 | 0 | | 10% | 15 | No | Hand pile areas too steep to Pile (10% of area) (contractor) |
| Burn Piles | 4976 | 1 | | AC | 15 | No | Burn piles. (FS) |
| Post-Activity Survey | 4347 | 1 | | ac | 15 | no | |
| Update Data Base | 0001 | 0 | | | 02 | No | |
| Stand Exam | 4315 | 10 | | | 02 | No. | Evaluate need for underburn |

Crook or sweep in bole
Dead or broken tops
Residual trees from original stand
Poor coloration
Large branch diameter
Insects and disease
Branches more than 45 degrees from horizontal
Physical or mechanical damage
Suppressed

These indicators shall determine cut trees, but slight defects may be acceptable for a particular leave tree if it is the best selection within a competitive group.

The number of leave trees per acre shall be a minimum/maximum allowance specified for each subitem in the Silvicultural Prescription. Example: 75/100 trees per acre. The Contractor shall monitor the number of leave trees using a sample plot method of his choice. (Random sampling by a circular plots is a popular method and will be used for quality assurance inspection on this contract.)

Contractor is responsible for recognizing any insect, disease, or animal damage problems and reporting them to the Contracting Officer's Representative. Major problems and treatment are described in the Silvicultural Prescription.

**NOTE**: The prescription objective is based on the overall composition and condition of the stand, and is intended to be a guideline for achieving a high quality final product in a professional manner. Contractor is expected to use silviculture knowledge to identify and adjust to any changing conditions within the stand or notify the Contracting Officer of such changing conditions.

## Cutting Methods

**Stump Height - Removal of Live Limbs**. All trees other than leave trees shall be cut below the lowest live limb, except when prevented by natural obstacles. All live limbs below the cutting point shall be removed. Trees shall be completely severed from the stump. Stump height shall not exceed 12 inches above ground level or 4 inches above natural obstacles. Stump height shall not exceed 2 inches above ground level within 30 feet of existing trails and shall be cut parallel to the ground.

**Felling**. Cut trees shall be felled away from unit boundaries, roads, telephone lines, established trails, stock driveways, fence lines, established land corners, and streams. Any trees falling on such areas shall be removed. Any tree felled into private land shall be pulled back into the thinning unit. All thinning slash shall be placed on or near the ground surface, so that it is not leaning against or suspended by an uncut tree, stump, log, or any obstacle. Snags may not be cut unless the Contractor elects to fall them for safety reasons. Snags felled, should be done prior to selecting leave trees within a distance equal to the height of the snag in the direction of fall.

**Minimum Height**. No trees are required to be cut that are less than that specified within the individual unit Silvicultural Prescription.

**Resource Protection**. The Contractor shall exercise extreme care to prevent damage to existing facilities, developments, and resources.

**Existing Facilities**. If existing facilities, such as roads, erosion dips, barriers, and drainage facilities are damaged, they shall be replaced or repaired at no cost to the Government.

**Protection of Streamcourses**. The Contractor shall minimize damage to streamcourses. Contractor must not enter within 50 feet of a scoured channel. Thinning must favor trees or shrubs species, particularly hardwoods, that provide the greatest benefit to riparian conditions within the riparian area. Thinning debris will be pulled out of or felled away from dry draws with defined channels and draws that have the potential to flow water.

**Prevention and Control of Soil Erosion**. The Contractor shall minimize soil erosion. Precautions shall include:

Prevention of gullying of roads and skid trails within and adjacent to the Thinning unit area.

The Contractor shall protect all "Areas to Protect", and all known and identified or discovered historic or prehistoric sites, buildings, objects, and properties related to American history, architecture, archaeology and culture against destruction, obliteration, removal or damage during Contractor's operations. The Contractor shall immediately notify the Forest Service if damage occurs to any Cultural Resources and immediately halt operations in the vicinity of the Resource where damage occurred until the Forest Service authorizes the Contractor to proceed. If such damage is negligently or willfully caused by the Contractor's operations, the Contractor shall bear costs of investigation and restoration in accordance with 36 CFR 296.14(c), provided that such payment shall not relieve Contractor from civil or criminal remedies otherwise provided by law. Wheeled or track-laying equipment shall not be operated within such areas except on approved roads, landings, tractor roads or skid trails. Unless agreed otherwise, trees shall not be felled into such areas.

Salvaging of boughs, small Christmas trees, and small round wood is allowed only on Black Butte with an appropriate valid permit. The permit(s) shall be obtained through the Rexford Ranger District prior to the start of the salvage operation(s). Salvaging is not allowed on the Orthrop Lake Item.

Slash shall be pulled back 5 feet from culverts on the fillslope.

All thinning shall be completed before salvaging may begin.

All section corners, culverts, fences, and bearing trees shall be protected from damage.

A minimum of 85% of activities will be in a non-compacted, non-puddling, and/or non-displaced condition.

Established Forest Service recreational trails form part of the unit area boundary. All thinning activity shall remain **50 feet** away from existing trails and no piling shall be allowed on trails. Trail crossing points will be designated prior to commencement of work. Slash will not be allowed in drainage bottoms.

## DEFINITIONS

**Access** – Access to units will be provided by the designated existing transportation system.

**Areas to Protect** – Areas designed and/or defined by the Forest Service that must be avoided, protected, or restricted.

**Average spacing** - means the average of the distances between all leave trees necessary to provide the desired number of leave trees per acre.

**DBH** – Diameter at Breast Height. Diameter of a tree measured outside of the bark at a height of 4.5 feet above ground level on the uphill side of the tree.

**Damage** - includes any defect or deformity of a tree resulting from agents such as wind, snow, animals, insects, disease, and equipment, and evidenced by dead or broken tops or trunks, crooks, and deep scars.

**Excess trees** - means uncut trees that do not meet specifications and should have been cut. Trees not severed from the stump, hangup trees, stumps with live limbs, trees not girdled or not girdled properly (if required) are also considered excess trees.

**Hangup tree** - means any cut tree suspended more than 3 feet off ground.

**Lop and Pile** – Process of cutting small conifers and piling this material in designated areas away from green residual trees.

**Minor damage** - means crooks in the trunk which are offset less than 3 inches from the long axis and within 13 feet of the ground, no forks, broken top, or bark damage extending more than one-fourth the circumference of the tree.

**Missing leave tree** - are trees cut that should have been left.

**Slash** – All vegetative material including cull logs, broken tops, limbs, branches, rotten wood, damaged or broken saplings and small poles.

**Spacing** - means the horizontal distance from the trunk of one leave tree to the trunk of the next nearest leave tree.

## CONTRACTOR RESPONSIBILITIES

2. **PERFORMANCE STANDARD** *The Contractor shall select and monitor the best leave trees in order to achieve the minimum/maximum allowance specified for each Item in the Silcicultural Prescription, Example: 75/100 trees per acre.* Not doing

Contractor is responsible for recognizing any insect, disease, or animal damage problems and reporting them to the Contracting officer's Representative. Major problems and treatments are described in Silvicultural Prescriptions.

**NOTE:** The prescription objective is based on the overall composition and condition of the stand, and is intended to be a guideline for achieving a high quality final product in a professional manner. Contractor is expected to use silviculture knowledge to identify and adjust to any changing conditions within the stand or notify the Contracting officer of such changing conditions.

**PERFORMANCE STANDARD**- Removal of Live Limbs. *All trees other than leave trees shall be cut below the lowest live limb, except when prevented by natural obstacles. All live limbs below the cutting point shall be removed. Trees shall be completely severed from the stump. Stump height shall not exceed 12 inches above ground level or 4 inches above natural obstacles.*

**PERFORMANCE STANDARD** Slash- *shall be piled by hand or excavator into piles that are compact and relatively free of dirt and decomposed duff. Piles shall be at least 10 feet from designated leave trees and unit boundaries. Roads shall be kept clear of Contractor created slash piles from the top of the cut slope to the toe of the fill. Piles shall not be less than 6 feet in height and not more than 15 feet in width. The slash shall be gathered and piled, with slash aligned in the same direction as much as possible. No stumps shall be placed in piles. Piles piled in teepee fashion are not acceptable.* Rolling the piles to compact them is preferred.

pilles will be bigger

**PERFORMANCE STANDARD** The *Contractor shall pile the majority of woody material less than six inches in diameter on the large end and leave a minimum of 5 tons per acre and a maximum of 10 tons per acre of the larger material evenly distributed throughout the units.*

**PERFORMANCE STANDARD** **Noxious Weeds Control Requirement**. *The Contractor shall clean all off-road equipment prior to entry onto the project area. Remove all dirt and plant parts and material that could carry noxious weed seeds into the project area. Only off-road equipment so cleaned and inspected by the Forest Service will be allowed to operate within the project area. Treat all subsequent move-ins of off-road equipment in the same manner as initial move-ins. "Off-road equipment" does not include personal vehicles or support equipment that remains on the main travel route.*

*Prior to the initial move-in, the Contractor shall make all off-road equipment available for inspection by the Forest Service at an agreed upon location. Provide the Forest Service at least 24 hours advance notification when equipment is ready for inspection.*

If the Contractor desires to clean off-road equipment on National Forest Land prior to moving to a new unit, the Contractor and the Forest Service shall agree on methods of cleaning, locations for the cleaning, and control of off-site impacts, if any.

Due to the dry sandy nature of the soils, ground disturbance should be kept to a minimum. On steeper ground the excavator shall not use the same path to move around to the extent that rutting in the traveled path begins to form. The excavator bucket work shall be done to minimize scarification and soil disturbance. Use existing skid trails where ever possible to minimize soil disturbance.

**Contractor Quality Control Inspection System**. In accordance with 52.246-4 Inspection of Services – Fixed Price (AUG 1996), Paragraph (b) the Contractor shall propose and adopt a quality control inspection system to ensure that the required work meets the specifications. The Contractor may use the Inspection and Acceptance Requirements stated under Government Responsibilities as an inspection system if desired. Any proposed inspection system shall produce written inspection data which shall be provided in a timely manner as agreed to by the Contracting Officer. The Contracting Officer may observe the Contractor's inspection at any time and shall otherwise have unlimited access to the inspection data.

***PERFORMANCE ASSESSMENT* PLAN (PAP)** In accordance with 52.246-4 Inspection of Services – Fixed Price (AUG 1996), Paragraph (c), the COR will inspect the Contractor's performance on a random basis under this contract to ensure that piling is being properly performed, the proper amount of slash is being left scattered throughout the units, and that equipment has been properly washed to prevent noxious weeds from being transported into the units.

Unacceptable performance occurs when the Contractor responsibilities fail to meet stated **PERFORMANCE STANDARDS**. The Government will not pay for unacceptable performance. When unacceptable performance is observed, the COR will document the unacceptable performance on a work order as well as meet with the Contractor at the job

site to ensure that the Contractor is aware of the unacceptable service. **<u>The Government's inspection of the work does not relieve the Contractor of its responsibility to provide an inspection system as stated in Paragraph (b) of the Clause stated above</u>**.

**<u>Inspection Procedure Piling</u>**

The Government will make a visual examination of the work. If the visual examination shows the work may not be done in conformance with the contract specifications the following systematic inspection procedure will be made:

The Government will make an inspection of each contract item to determine acceptability. The results will not be averaged with any other item for payment purposes. The Contractor is encouraged to observe the inspection. Inspection consists of checking piles for compaction, size, and non-burnable material. In addition, Browns Down Woody Fuel Surveys will be the method for determining ton per acre of material remaining on site.

**<u>Inspection of Slash Treatment</u>**. Acceptance will be determined by an inspection of the areas requiring treatment and will be based on adherence to the specifications. Nonconformance with any of the specifications will classify the treatment as unsatisfactory and rework will be required to bring the treatment up to specification standards.

**<u>Inspection of Slashing</u>**
The Government will make a visual examination of the work. If the visual examination shows the work may not be done in conformance with the contract specifications the following systematic inspection procedure will be made:

A series of plots distributed over the entire unit will be taken. Plot centers will be marked and numbered.

Each plot will be examined and the findings on the items listed below recorded:

Number of leave trees that should have been left.

Number of trees that were left.

Number of satisfactory leave trees.

Number of excess trees.

Upon inspection of all plots for a unit, the quality of thinning shall be calculated as follows:

$$\text{Quality\%} = \frac{1.00 - (\text{No. of missing leave trees} + \text{No. of excess trees}) \times 100}{(\text{No. of leave trees that should have been left})}$$

**<u>Measurement</u>**. The acreage of each unit was made using Global Positioning System measurements. Noxious Weeds Control Requirements is incidental to slash piling.

**Basis Of Payment**. Payment will be made at the contract unit price for work completed and accepted in accordance with the above required specifications.

PERFORMANCE REQUIREMENTS SUMMARY

| **Requirement** | **Performance Standard** | **Method of Assessment** | **Incentive/Deduction** |
|---|---|---|---|
| Piling | Piles constructed to the described size, reasonably free of dirt or duff, compact, spaced away from leave trees and other objects, and with stems properly oriented. | Random Sample | Rework to correct defiencies. |
| Unpiled Wood Material | Leaving the designated amount of properly sized woody material scattered throughout the unit. | Random Sample | If more than 7 tons/acre are left unpiled the unit shall be reworked. |
| Noxious Weeds Control | Equipment to be washed and free of dirt and weeds. | Random Sample | Equipment not permitted to enter unit until it passes inspection. |
| Tree Selection | Selecting the best trees in each competitive grouping which will produce the required number of leave trees per acre. | Random Sample | If excess trees the unit shall be reworked as discussed below. If uncorrectable payment will be reduced. |
| Stump Height and Low Live Limbs | Trees to be cut below the lowest line limb or not higher than 12 inches above ground. Trees completely severed from the stump. All live limbs completely severed when not able to cut trees below the lowest limb | Random Sample | Rework to correct defiencies. |
| Noxious Weed Control | Equipment to be washed and free of dirt and weeds. | Random Sample | Equipment not permitted to enter unit until it passes inspection. |

**Rework and Reinspection after Rework** When inspection results are below 80% and excess trees constitute a part of the defiency, payment will not be made until the excess tree deficiency has been corrected, unless the Contracting Officer determines excess tree deficiency to be minor or and isolated situation that will not result in any material differences in the total number of trees to be left.

When inspection results are below 80% and deficiency is non-correctable, then no payment will be made for the item. Inspection after the rework will be made in the same manner as the first inspection, but on different plot sites. The Contractor shall pay for inspections necessitated by the rework

# OTHER CONSTRAINTS ON PERFORMANCE

## Contract Time and Required Rate of Progress

| Item No. | Est. Start Work Date | Completion Date (Mandatory) |
|---|---|---|
| 2.1 Black Butte Fuels | 3 Days After NTP | July 31, 2004 |
| 3.1 Orthrop Lake Fuels | 3 Days After NTP | July 31, 2004 |

The Government has the right to direct the Contractor on which unit to start work.

The Contractor shall maintain progress at a rate, which will assure completion of all work by the mandatory completion dates stated above.

The Government will issue a Notice to Proceed as soon as weather and ground conditions are favorable for work.

# MEASUREMENT AND PAYMENT

## Methods of Measurement.

Acreage was measured on a horizontal plane using a Global Positioning System. Measurement for lump sum treatment areas will be as follows: The acreages shown are for information only to aid the quoter in determining the approximate size of the units, and are not guaranteed. Prices offered in the schedule of items are to be for the entire unit on a lump sum basis.

## Payments

Payment will be made for fully acceptable work at the prices shown in the Schedule of Items. In the event of extended non-work periods because of adverse weather, the Contracting Officer may authorize progress payments for partially completed units.

## FINAL PAYMENT

| ***SILVICULTURAL DIAGNOSIS AND PRESCRIPTION*** | | | | |
|---|---|---|---|---|
| ***Project Name & Unit #***: Orthrop Lake | | | | ***Stand ID***: |
| ***Parent Stands:17-07-021*** | | | | |
| ***Unit Acres:*** | ***Landtype:, 324*** | ***Slope:10-50%*** | ***Aspect:Rolling*** | ***Elevation: 3100*** |
| ***Habitat Type***: PSME/CARU | | | | |
| ***Mgmt. Area:***13 | ***Topography: MID-SLOPE*** | | ***Operability: Tractor*** | ***Stockability:80-90%*** |
| ***Potential Productivity in cubic feet/ac/yr: 40-60*** | | | | |

## ***Management Objectives***

MA-13 objectives are to provide the special habitat necessary for old –growth dependant wildlife in units that represent the major habitat types and tree species of each drainage.

**Specific objectives for this project are as follows:**

- **Achieve desirable and sustainable conditions in low-elevation, dry forest types by reducing stand densities, maintaining and enhancing desirable species composition and size, and reducing the risk of insect and disease epidemics**

- Reduce naturally occurring fuel accumulations in low-to-mid elevation stands to lower the potential for wildfires escaping initial attack and becoming large-scale wildfires, and to protect forest resources

- Improve big game winter range conditions by rejuvenating browse species through the use of prescribed fire

## ***Condition***

This is a multistory DF/WL stand with the oldest cohort composed of 14"-30" +DBH DF (80%), and WL(20%). The Wl occurs only in the moister draws and cool north and east facing slopes. The Basal area of this cohort ranges from 40-140 $ft^2$/acre, but averages 60-100 $Ft^2$/acre. The younger cohorts consist of 3-12" dbh DF stocked at 20-40 $FT^2$/acre Overall Vigor is fair to poor for WL and DF, but declining due to the relatively high stocking level.. This stand currently meets Green, et al. criteria for Old Growth. Soils have developed from glacial till and fractured bedrock and are 85-90% stockable . There is 1-2% past detrimental soil disturbance. The habitat type is PSME/CARU with inclusions of PSME/LIBO in the moister areas. Cover is variable, very sparse in areas of dense understory, and up to 60% in the more open areas. Cover consists of various mixes of Caru, FEID, FESC, ARUV, AMAL and BERE. The forage is poor to fair in vigor, with the existing shrub cover very decadent. Ground fuels are moderate , 10-20 tons/ac, consisting mostly of dead branches. Ladder fuels are heavy to extreme, consisting of dead branches extending to the ground on the smaller diameter DF.

***Target Stand Description***

The target stand is a mosaic of fire-maintained park-like Douglas-fir/Ponderosa pine /Western larch stands. Grasses would generally dominate the ground cover with a light to moderate component of shrubs occurring in some areas. The relative forage value for big-game would be fair to good. Fuel loads would be light and ladder fuels would occur only in a few isolated patches. Both long and short term VQO's should meet partial retention. Risk for DF beetle attack would be moderate to low.

***Diagnosis***

Overall vigor of this stand is fair to poor and declining in part due to heavy stocking. Forage value and vigor is poor. Ladder fuels are high to extreme and are conducive to a stand replacement event. The current stocking is too dense to allow a park-like Douglas-fir/Ponderosa/WL stand to continue to develop. Forage conditions need to be improved. Reducing the basal area to 60-80 $ft^2$/acre, followed by a light to moderate underburn would allow the development of a park-like Douglas-fir/Ponderosa pine/WL stand and stimulate forage production. However underburning alone in this unit is likely to reduce overall stocking to 20 $ft^2$/acre or less. Therefore at this entry smaller diameter stems should be slashed to reduce ladder fuels, and the resulting fuels should be piled and burned along with other activity fuels .

***Prescribed Treatment***

**Precommercial thinning.**Reduce stocking by thinning from below to an average 80-100 trees per acre, approximately 70-90ft²/acre, using the following specifications:

- Cut all stems less than 7" DBH

**Year 0 or 1 Hazard Reduction**

Pile thinning slash (contractor) and burn piles (FS). In areas over 50% slope (approximately 10-15% of area), had pile slash.

**Year 0 or 1 (4347)** Conduct a **post activity survey** to check if the objectives of the prescription were attained. Specific Items to observe during this survey are as follows:

1. Residual stocking
2. Distribution of stocking
3. Forage value, species germinating and resprouting.
4. Fuel load
5. Distribution of fuel load.

**Future Needs**. 5-10 years after this treatment examine the stand with a walkthrough survey to determine when to schedule undebuning. Specific items to observe during this survey are as follows: .

1. Residual stocking
2. Distribution of stocking
3. Forage value, species germinating and resprouting.
4. Fuel load
5. Distribution of fuel load.

These treatment would meet the VQO of retention.

The following diagnosis table details options considered to manage this stand to meet target stand objectives.

| | Currently Meets Target? | Can be modified to meet target? | Sanitation/Salvage | Uneven-age mgmt? | Shelterwood | Seed tree | Clearcut with reserves |
|---|---|---|---|---|---|---|---|
| | No fuel loads are too high in some areas and current trajectory would not allow the development of a fire-maintained, Park-like Douglas-fir/WL/ponderosa pine stand. . | Yes, can be thinned to lessen ladder fuels and to slightly reduce stocking, increase vigor, and develop a park-like DF/PP/WL stand piling and burning of submerchat this entry will facilitate future underburning. . | NO, CURRENT MORTALITY IS TOO LIGHT. | Yes, but multi-storied structure would increase ladder fuels and preclude the use of underbrning to tree future fuel accumulations. | No, would not meet short-term target stand objectives of EIS. | No, would not meet short-term target stand objectives of EIS. | No, would not short-term meet target stand objectives of EIS. . |

***SILVICULTURAL DIAGNOSIS AND PRESCRIPTION***

| | | | | |
|---|---|---|---|---|
| *Project Name & Unit #*: Back Butte Fuels | | | | *Stand ID*: |
| *Parent Stands:16-03-047,048* | | | | |
| *Unit Acres:* | *Landtype:, 303, 324* | *Slope:10-20%* | *Aspect:NW* | *Elevation: 3300-3650* |
| *Habitat Type*: PSME/CARU with inclusions of DF/SYAL and DF/FESC | | | | |
| *Mgmt. Area:*11 | *Topography: lower slope* | | *Operability: Tractor* | *Stockability:80%* |
| *Potential Productivity in cubic feet/ac/yr: 40-60* | | | | |

***Management Objectives***

Maintain or enhance winter range while producing a programmed yield of timber and maintaining the viewing resource in areas of high visual significance. Timber harvest will be used to develop and maintain optimum cover/forage ratios by cycling cutting units through seral stages. Where planting is used, favor Douglas-fir and ponderosa pine. Other specific objectives can be found in the West Kootenai Ecosystem Restoration EA.

***Condition***

This unit consists of a multi-cohort stand of 40-200 + year old PP (10%), DF (90%) and WL (trace). Diameters range from 4 to 30" DBH. Basal areas range from 40-200 ft²/acre, but averaging about 90 ft²/acre. Stocking is clumpy with areas of heavy stocking of 12-20" DBH DF. There are about 2-6 PP per acre over 14" DBH, with a few up to 30"DBH. The overall vigor of trees in the unit appears to be fair to poor. The crowns of the PP component are decreasing due to inter-tree competition. Soils are formed on glacial till and fractured bedrock and are 80% stockable and plantable. Existing detrimental disturbance based on visual estimate is 10-12%. About 15% of the area consists of unstockable rocky inclusions. The habitat type is generally PSME/CAR, with some inclusions of PSME/SYAL and PSME/FESC. Cover varies from 20-80% consisting of various combinations of CARU, BERE, SYAL, FESC, FEID, SHCA, AMAL and PUTR . Forage value is fair to good , with the vigor of the forage species fair. There is evidence of moderate to heavy elk use. Ground fuels are generally light 10-15 tons/acre, with some concentrations up to 30 tons/acre. . Ladder fuels are moderate to heavy and increasing. Needle/duff depth is variable, ranging from 1-2". .

***Target Stand Description***

The target stand is a mosaic of fire-maintained park-like Douglas-fir/Ponderosa pine /Western larch stands. Grasses would generally dominate the ground cover with a light to moderate component of shrubs occurring in some areas. The relative forage value for big-game would be fair to good. Fuel loads would be light and ladder fuels would occur only in a few isolated patches. Both long and short term VQO's should meet partial retention. Risk for DF beetle attack would be moderate to low.

***Diagnosis***

Overall vigor of this stand is fair to fair , with the vigor of the PP is declining in part due to heavy stocking. Forage value and vigor is fair to good. Ladder fuels are moderate to heavy and are developing conditions conducive to a stand replacement event. The current stocking is too dense to allow a park-like Douglas-fir/Ponderosa stand to develop. Forage conditions need to be improved. Reducing the basal area to an average of 60-80 ft²/acre, followed by a light to moderate underburn would allow the development of a park-like Douglas-fir/Ponderosa pine stand and stimulate forage production. However underburning alone in this unit is likely to reduce overall stocking to 20 ft²/acre or less. Therefore at this entry stems should be slashed to reduce ladder fuels, and the resulting fuels should be piled and burned along with other activity fuels .

These treatments would meet the VQO of partial retention.

The following diagnosis table details the options considered to manage this stand to meet target stand objectives.

| | Currently Meets Target? | Can be modified to meet target? | Sanitation/Salvage | Uneven-age mgmt? | Shelterwood | Seed tree | Clearcut with reserves |
|---|---|---|---|---|---|---|---|
| | No fuel loads are too high in some areas and current trajectory would not allow the development of a fire-maintained, Park-like Douglas-fir/ponderosa pine/WL stand. . | Yes, can be thinned to reduce stocking, increase vigor, and develop a park-like DF/PP/WL stand Piling and burning of submerch at this entry will facilitate future underburning. . | NO, CURRENT MORTALITY IS TOO LIGHT. | Yes, stand could be managed for multi-cohort structure, dominated by trees in A and B Stratum. | No, would not meet short-term target stand objectives of EIS. | No, would not meet short-term target stand objectives of EIS. | No, would not short-term meet target stand objectives of EIS. |

***Prescribed Treatment***

**Commercial thinning.** Reduce stocking by thinning from below to an average of 60-80 ft²/acre. Vigor of the larger PP is to be maintained or improved by reducing competition for light, water and crown spacer. To achieve this objective use the following specifications

- Harvest all stems in unit less than 8" DBH, unless otherwise indicated.
- Leave all PP and WL 14" DBH and larger
- Harvest all stems except 14'DBH + PP and WL for a radius of 20 feet (outside bark) from each 14" DBH + PP or WL.
- In areas where leaving the trees above would not result in 70 trees/acre (approx. 25' X 25" spacing), , leave the largest most vigorous trees up 70 trees /acre (approx. 25' X 25" spacing, giving WL and PP a priority over DF, but giving size and vigor criteria a higher precedence than species preference.
- Leave 2-4 sound snags over 10" DBH where available
- Harvest or slash all other stems not retained as indicated above

**Year 0 or 1 Hazard Reduction**

Pile thinning slash (contractor) and burn piles (FS).

1-3 years after burning the piles, underburn the entire unit when conditions are correct for a burn of low-moderate intensity and severity. There are three objectives of this burn:

1. To decrease ground fuels by burning 70-90% of the fuels less than 3" in diameter.
2. Maintain or increase forage quality and quantity.

3. To have 20% or less leave-tree mortality resulting from the underburn.

**Year 1** and **after underburn (4347)** Conduct a **post activity survey** to check if the objectives of the prescription were attained. Specific Items to observe during this survey are as follows:

1. Residual stocking
2. Distribution of stocking
3. Forage value, species germinating and resprouting.
4. Fuel load
5. Distribution of fuel load.

**Future Needs**. 5-10 years after this treatment examine the stand with a walkthrough survey to determine when to schedule next undebuning. Specific items to observe during this survey are as follows: .

1. Residual stocking
2. Distribution of stocking
3. Forage value, species germinating and resprouting.
4. Fuel load
5. Distribution of fuel load.

Joe Lewicki 12/2/2002

## *SILVICULTURAL PRESCRIPTION FUNDING SUMMARY*

| | | |
|---|---|---|
| PROJECT NAME/UNIT #: Black Butte Fuels | | ACRES: |
| STAND ID: | TREATMENT: Commercial Thinning, | |
| PREPARED BY: Joseph lewicki | DATE:12/01/2002 | |

| ACTION: | ACTIVITY CODE | TIME LINE | YEAR | FUND UNITS | KV CODE | PROTECT? | NOTES: |
|---|---|---|---|---|---|---|---|
| Prescription | 4334 | 0 | | AC | 37 | | |
| Commercial thinning | 4220 | 0 | | AC | 12 | | Commercial thinning<br>Reduce stocking by thinning from below to an average of 60-80 ft²/acre. Vigor of the larger PP is to be maintained or improved by reducing competition for light, water and crown spacer. To achieve this objective use the following specifications<br>• Harvest all stems in unit less than 8" DBH.<br>❑ Leave all PP and WL 14" DBH and larger<br>• Harvest all stems except 14'DBH + PP and WL for a radius of 20 feet (outside bark) from each 14" DBH + PP or WL.<br>❑ In areas where leaving the trees above would not result in 70 trees/acre, , leave the largest most vigorous trees up 70 trees /acre, giving WL and PP a priority over DF, but giving size and vigor criteria a higher precedence than species preference. |
| Slashing | 4982 | 0 | | Ac | 15 | | Slash all stems not designated for retention. |
| Fuels Treatment (contractor) | 4983 | 0 | | AC | 15 | No | Pile thinning slash, and other activity and ground fuels. |
| Burn Piles | 4976 | 1 | | AC | 15 | No | Burn piles. (FS) |
| Fuels Treatment | 4963 | 2-3 | | AC | 15 | No | Underburn total acres. (FS) |
| Post-Activity Survey | 4347 | 1, 3 | | ac | 15 | no | Survey after Piling and again after underburning. |
| Update Data Base | 0001 | 0 | | | 02 | No | |
| Stand Exam | 4315 | 10 | | | 02 | No | Evaluate need for next underburn |

# TERMS AND CONDITIONS (SERVICES)

**CLAUSES INCORPORATED BY REFERENCE**
**(FAR 52.252-2) (FEB 1998)**

This contract incorporates one or more clauses by reference, with the same full force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at this address: **www.arnet.gov/far**

I. Federal Acquisition Regulation (48 CFR Chapter I) Clauses

52.211-18 Variation in Estimated Quantity (APR 1984)
52.222-3 Convict Labor (JUN 2003)
52.222-21 Prohibition of Segregated Facilities (FEB 1999)
52.222-41 Service Contract Act of 1965, as Amended (MAY 1989)
52.223-5 Pollution Prevention and Right-to-Know Information (APR 1998)
52.223-6 Drug-Free Workplace (MAY 2001)
52.225-1 Buy American Act—Supplies (JUN 2003)
52.225-13 Restrictions on Certain Foreign Purchases (JUN 2003)
52.229-3 Federal, State and Local Taxes (JAN 1991)
52.232-1 Payments (APR 1984)
52.232-11 Extras (APR 1984)
52.232-23 Assignment of Claims (JAN 1986)
52.232-25 Prompt Payment (FEB 2002)
52.232-34 Payment by Electronic Funds Transfer-Other than Central Contractor Registration (MAY 1999)
52.233-1 Disputes (JUL 2002)
52.233-3 Protest after Award (AUG 1996)
52.242-14 Suspension of Work (APR 1984)
52.243-1 Changes--Fixed Price (AUG 1987) Alternate I (APR 1984)
52.244-6 Subcontracts for Commercial Items (APR 2003)
52.245-4 Government-Furnished Property (Short Form) (JUN 2003)
52.246-4 Inspection of Services--Fixed Price (AUG 1996)
52.249-1 Termination for Convenience of the Government (Fixed-Price) (Short Form) (APR 1984)
52.249-8 Default (Fixed-Price Supply and Service) (APR 1984)

**(The following clauses are applicable for acquisitions over $10,000.)**

52.222-26 Equal Opportunity (APR 2002)
52.222-35 Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (APR 1998)
52.222-36 Affirmative Action for Workers with Disabilities (JUN 1998)
52.222-37 Employment Reports on Disabled Veterans and Veterans of the Vietnam Era (JAN 1999)

**(The following clauses are applicable for acquisitions over $25,000.)**

52.209-6 Protecting the Government's Interest when Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment (JUL 1995)

**STATEMENT OF EQUIVALENT RATES FOR FEDERAL HIRES (FAR 52.222-42) (MAY 1989)**

In compliance with the Service Contract Act of 1965, as amended, and the regulations of the Secretary of Labor (29 CFR, Part 4), this clause identifies the classes of service employees expected to be employed under the contract and states the wages and fringe benefits payable to each if they were employed by the contracting agency subject to the provisions of 5 U.S.C. 5341 or 5332.

THIS STATEMENT IS FOR INFORMATION ONLY;
IT IS NOT A WAGE DETERMINATION

HOURLY COMPENSATION

| Employee Class | Monetary Wage-Fringe Benefits* |
|---|---|
| | $ |
| | $ |

***Fringe Benefits**:

Life, accident, and health insurance and sick leave programs, 5.1 percent of basic hourly rate.

Paid Holidays: 10 per year

| | |
|---|---|
| New Year's Day | Labor Day |
| Washington's Birthday | Columbus Day |
| Martin Luther King Birthday | Veterans Day |
| Memorial Day | Thanksgiving Day |
| Independence Day | Christmas Day |

Vacation: 13 days paid vacation per year up to 3 years of service, 20 days after 3 years of service, and 26 days after 15 years of service.

Retirement: Employees under Federal Employees Retirement System, 21-1/2%; Employees under Civil Service Retirement System, 8.45%.

**DISCOUNTS FOR PROMPT PAYMENT (FAR 52.232-8) (FEB 2002)**

(a) Discounts for prompt payment will not be considered in the evaluation of offers. However, any offered discount will form a part of the award, and will be taken if payment is made within the discount period indicated in the offer by the offeror. As an alternative to offering a discount for prompt payment in conjunction with the offer, offerors awarded contracts may include discounts for prompt payment on individual invoices.

(b) In connection with any discount offered for prompt payment, time shall be computed from the date of the invoice. If the Contractor has not placed a date on the invoice, the due date shall be calculated from the date the designated billing office receives a proper invoice, provided the agency annotates such invoice with the date of receipt at the time of receipt. For the purpose of computing the discount earned, payment shall be considered to have been made on the date which appears on the payment check or, for an electronic funds transfer, the specified payment date. When the discount date falls on a Saturday, Sunday, or legal holiday when the Federal Government offices are closed and Government business is not expected to be conducted, payment may be made the following business day.

**MATERIAL AND WORKMANSHIP (FAR 52.236-5) (APR 1984)**

(a) All equipment, material, and articles incorporated into the work covered by this contract shall be new and of the most suitable grade for the purpose intended, unless otherwise specifically provided in this contract. References in the specifications to equipment, material, articles, or patented processes by trade name, make, or catalog number, shall be regarded as establishing a standard of quality and shall not be construed as limiting competition. The Contractor may, at its option, use any equipment, material, article, or process that, in the judgment of the Contracting Officer, is equal to that named in the specifications, unless otherwise specifically provided in this contract.

(b) The Contractor shall obtain the Contracting Officer's approval of the machinery and mechanical and other equipment to be incorporated into the work. When requesting approval, the Contractor shall furnish to the Contracting Officer the name of the manufacturer, the model number, and other information concerning the performance, capacity, nature, and rating of the machinery and mechanical and other equipment. When required by this contract or by the Contracting Officer, the Contractor shall also obtain

the Contracting Officer's approval of the material or articles which the Contractor contemplates incorporating into the work. When requesting approval, the Contractor shall provide full information concerning the material or articles. When directed to do so, the Contractor shall submit samples for approval at the Contractor's expense, with all shipping charges prepaid. Machinery, equipment, material, and articles that do not have the required approval shall be installed or used at the risk of subsequent rejection.

(c) All work under this contract shall be performed in a skillful and workmanlike manner. The Contracting Officer may require, in writing, that the Contractor remove from the work any employee the Contracting Officer deems incompetent, careless, or otherwise objectionable.

**SUPERINTENDENCE BY THE CONTRACTOR (FAR 52.236-6) (APR 1984)**

At all times during performance of this contract and until the work is completed and accepted, the Contractor shall directly superintend the work or assign and have on the work a competent superintendent who is satisfactory to the Contracting Officer and has authority to act for the Contractor.

**PERMITS AND RESPONSIBILITIES (FAR 52.236-7) (NOV 1991)**

The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work. The Contractor shall also be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence. The Contractor shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire work, except for any completed unit of work which may have been accepted under the contract.

**ACCIDENT PREVENTION (FAR 52.236-13) (NOV 1991)**

(a) The Contractor shall provide and maintain work environments and procedures which will--

(1) safeguard the public and Government personnel, property, materials, supplies, and equipment exposed to Contractor operations and activities;

(2) avoid interruptions of Government operations and delays in project completion dates; and

(3) control costs in the performance of this contract.

(b) For these purposes on contracts for construction on dismantling, demolition, or removal of improvements, the Contractor shall--

(1) Provide appropriate safety barricades, signs, and signal lights;

(2) Comply with the standards issued by the Secretary of Labor at 29 CFR Part 1926 and 29 CFR Part 1910; and

(3) Ensure that any additional measures the Contracting Officer determines to be reasonably necessary for the purposes are taken.

(c) If this contract is for construction or dismantling, demolition or removal of improvements with any Department of Defense agency or component, the Contractor shall comply with all pertinent provisions of the latest version of U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385-1-1, in effect on the date of the solicitation.

(d) Whenever the Contracting Officer becomes aware of any noncompliance with these requirements or any condition which poses a serious or imminent danger to the health or safety of the public or Government personnel, the Contracting Officer shall notify the Contractor orally, with written confirmation, and request immediate initiation of corrective action. This notice, when delivered to the Contractor or the Contractor's representative at the work site, shall be deemed sufficient notice of the noncompliance and that corrective action is required. After receiving the notice, the Contractor shall immediately take corrective action. If the Contractor fails or refuses to promptly take corrective action, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. The Contractor shall not be entitled to any equitable adjustment of the contract price or extension of the performance schedule on any stop work order issued under this clause.

(e) The Contractor shall insert this clause, including this paragraph (e), with appropriate changes in the designation of the parties, in subcontracts.

**FIRE CONTROL**

(a) **Contractor's Responsibility for Contractor Caused Fires**

The Contractor, whether or not directed by the Forest Service, shall immediately extinguish without expense to the Government, all fires on or in the vicinity of the project which are caused by Contractor's employees, whether set directly or indirectly as a result of Contractor operations. The Contractor may be held liable for all damages and costs of additional labor, subsistence, equipment, supplies, and transportation resulting from fires set or caused by the Contractor's employees or resulting from contract operations.

(b) **Other Fires**

For the purpose of fighting forest fires on or in the vicinity of the project which are not caused by the Contractor or his employees, the Contractor, when requested by the Contracting Officer, shall place his employees and equipment temporarily at the disposal of the Forest Service. Payment for such services will be made by the Government at not less than the current rate for fire-fighting services established by the Forest Service in the area concerned.

Any employees and equipment furnished will be relieved from fire fighting as soon as the Forest Service finds that it is practicable to employ other labor and equipment adequate for the protection of the area.

An equitable adjustment in contract time may be made for this period.

(c) **Fire Protection Requirements - Fire Plan**

During the fire season period, as specified by State law, the Contractor shall comply with each of the following provisions to the extent applicable to his operation under the contract.

(1) **Fire Tools**. The Contractor will provide for each employee in the contract area at least one approved hand tool of a type appropriate in the contract area, such as shovel, pulaski, or ax. Tools required and furnished under (2) and (4) below, shall count toward fulfillment of the above requirement. Where additional tools, beyond those required under (2) and (4) below, are to be provided, the Contractor shall seal such tools in one or more boxes painted red and marked "Tools for Fire Only." All tools required herein shall be kept sharp and in good serviceable condition and maintained at locations to be designated by the Forest Service.

(2) **Fire Extinguishers and Tools on Mobile or Stationary Equipment**. Each unit of powered equipment used in connection with this contract, including automobiles, trucks, tractors, etc., shall be equipped with serviceable tools and fire extinguishers as follows:

**One** - fire extinguisher, dry chemical type of not less than 2-1/2-pound capacity with 4 BC or higher rating.

**One** - shovel, round point #0 lady or equal.

**One** - ax, 2 pounds or over, 26-inch minimum length, or one pulaski.

**One** - water container (at least 1-gallon capacity), not required with stationary equipment.

(3) **Spark Arresters**. Each internal combustion engine shall be provided with a spark arrester or spark arresting device approved by the Forest Service. Exceptions where the Forest Service may approve mufflers, or other equipment in lieu of spark arresters qualified and rated under Forest Service Standard 5100-1a are: (a) small multiposition engines, such as chain saws, shall meet Society of Automotive Engineers J335b standards; (b) passenger-carrying vehicles and light trucks may have baffle-type mufflers with tail pipe; (c) heavy-duty trucks may have a vertical stack exhaust system and muffler, provided the exhaust stack extends above the cab of the vehicle. An exhaust-driven turbocharger is considered to be a satisfactory spark arrester.

Internal combustion engine exhaust systems, arresters, and other devices must be properly installed and maintained.

(4) **Powersaws**. For each powersaw used in connection with this contract, the following will be provided:

**One** - shovel, round point #0 lady or equal. Shovel must be immediately available for use.

**One** - Fire extinguisher, containing not less than 8 ounces of extinguisher fluid, or a dry chemical powder-type of not less than 1-pound capacity. The extinguisher must be immediately accessible to the saw operator all times.

Any fueling or refueling of a powersaw shall only be done in an area which has first been cleared or is free of all material capable of carrying fire; powersaw shall be moved at least 10 feet from place of fueling before starting.

(5) **Blasting**. Fuse or prima cord shall not be used unless authorized in writing by the Contracting Officer with special precautions stated.

(6) **Smoking**. Smoking shall not be permitted within the contract area except on surfaced or dirt roads, at landings, within closed vehicles, in camps, or at other posted places, and shall never be allowed while working or traveling on foot.

(7) **Storage of Petroleum and Other Highly Flammable Products**. Gasoline, oil, grease, or other highly flammable material will be stored either in a separate building used exclusively for such storage, or at a site where all combustible debris and vegetation is cleared away within a radius of 25 feet. Fire extinguishers and/or sand barrels may be required at such locations specified by the Forest Service when unusually hazardous conditions exist.

(8) **Debris Burning and Warming Fires**. Burning permits will be required for all debris burning fires. Lunch and warming fires may be allowed in fireproofed areas during periods of low fire danger if and as specified in the fire plan. Such fires must not be left burning unattended.

(9) **Precautions for Stoves**. Stovepipes on all temporary buildings, trailers, and tents using wood burning stoves, will be equipped with roof jacks and serviceable spark arresters of mesh with openings no larger than 5/8 inch. All stovepipes, inside and out, will not be closer than 2 feet from any wood or other flammable material or 1 foot if the combustible material is protected by a metal or asbestos shield.

(10) **Welding**. Welding or use of cutting torches will be permitted only in areas that have been cleared or are free of all material capable of carrying fire. Flammable debris and vegetation must be removed from within a minimum of 10 feet radius of all welding and cutting torch operations. A shovel and a 5-gallon standard backpack water container (filled) with hand pump attached, shall be immediately available for use in the event of a fire start.

(11) **Fire Plan**. Prior to initiating work on the contract area, during the closed fire season period, a fire prevention and suppression plan will usually be prepared. The Contractor and the Forest Service will jointly prepare this plan. Such plan shall include a detailed list of men and equipment at the Contractor's disposal for implementing the plan. The fire plan shall also specify additional measures and/or special requirements, such as Hoot Owl restrictions, necessary during periods of critical fire weather conditions. When Hoot Owl restrictions are invoked, the Forest Service may curtail or shut down all or portions of a Contractor's operations. The following requirements may be imposed:

a. All high fire risk operations could be terminated at 1300 local time.

b. All burning could be stopped, including debris burning fires.

c. Patrolman may be required for a period of 2 hours after high fire-risk operations and 1 hour after end of work shift. The Contractor shall provide the patrolman unless the contract is for equipment rental, in which case the Government will provide the patrolman.

**USE OF PREMISES (AGAR 452.236-72) (NOV 1996)**

(a) Before any camp, quarry, borrow pit, storage, detour, or bypass site, other than shown on the drawings, is opened or operated on USDA lands or lands administered by the USDA, the Contractor shall obtain written permission from the Contracting Officer. A camp is interpreted to include a campsite or trailer parking area of any employee working on the project for the Contractor.

(b) Unless excepted elsewhere in the contract, the Contractor shall (i) provide and maintain sanitation facilities for the work force at the site and (ii) dispose of solid waste in accordance with applicable Federal, State and local regulations.

**SITE VISIT (FAR 52.237-1) (APR 1984)**

Offerors or quoters are urged and expected to inspect the site where services are to be performed and to satisfy themselves regarding all general and local conditions that may affect the cost of contract performance, to the extent that the information is reasonably obtainable. In no event shall failure to inspect the site constitute grounds for a claim after contract award.

**PROTECTION OF GOVERNMENT BUILDINGS, EQUIPMENT, AND VEGETATION (FAR 52.237-2) (APR 1984)**

The Contractor shall use reasonable care to avoid damaging existing buildings, equipment, and vegetation on the Government installation. If the Contractor's failure to use reasonable care causes damage to any of this property, the Contractor shall replace or repair the damage at no expense to the Government as the Contracting Officer directs. If the Contractor fails or refuses to make such repair or replacement, the Contractor shall be liable for the cost, which may be deducted from the contract price.

**ARCHAEOLOGICAL OR HISTORIC SITES**
**(AGAR 452.236-73) (FEB 1988)**

If a previously unidentified archaeological or historic site(s) is encountered, the Contractor shall discontinue work in the general area of the site(s) and notify the Contracting Officer immediately.

**SERVICE CONTRACT ACT REQUIREMENTS**

The Department of Labor has issued a Wage Determination applicable to this contract. Each service employee employed in the performance of this contract by the contractor or any subcontractor shall be paid not less than the minimum monetary wages and shall be furnished fringe benefits as specified in the attached determination.

Any class of service employee which is not listed but will be employed under the contract shall be classified by the employer prior to performance of contract work by the employee so as to provide a reasonable relationship to the classifications listed in the Wage Determination.

**ATTACHMENTS TO TERMS AND CONDITIONS**

The attachments listed below are hereby made part of this solicitation and any resultant contract:

1.

**EMPLOYMENT OF ELIGIBLE WORKERS (FSAR 4G52.222-701) (DEC 1999)**

Section 274A of the Immigration and Nationality Act (8 USC 1324a) makes it unlawful for an employer to hire unauthorized aliens. The Immigration and Naturalization Service (INS) has established the Form I-9, Employment Eligibility Verification Form, as the document to be used for employment eligibility verification (see 8 CFR 274a).

The contractor is required to 1) have all employees complete and sign the I-9 Form to certify that they are eligible for employment; 2) examine documents presented by the employee and ensure the documents appear to be genuine and related to the individual; 3) record information about the documents on the form, and complete the certification portion of the form; 4) retain the form for three years, or one year past the end of employment of the individual, whichever is longer.

It is illegal to discriminate against any individual (other than a citizen of another country who is not authorized to work in the U.S.) in hiring, discharging, or recruiting because of that individual's national origin or citizenship status.

Compliance with Section 274A of the Immigration and Nationality Act (8 USC 1324a) is a material condition of the contract. If the contractor employs unauthorized workers during contract performance in violation of section 274A, the Government may terminate the contract, in addition to other remedies or penalties prescribed by law.

For further information on the requirements of the Act, contractors should contact the Employer and Labor Relations Officer of their local INS office.

**LABOR STANDARDS FOR CONTRACTS INVOLVING MIGRANT AND SEASONAL AGRICULTURAL WORKERS (FSAR 4G52.222-702) (DEC 1999)**

(a) **General**. This contract is subject to the Migrant and Seasonal Agricultural Workers Protection Act (MSPA) (29 USC 1801-1872) and to Department of Labor regulations implementing MSPA (see 29 CFR 500). The purpose of MSPA is to eliminate activities that are detrimental to migrant and seasonal agricultural workers, to require registration of farm labor contractors, and to assure necessary protections for the workers. In addition to traditional farm labor activities, the Act applies to predominately manual forestry work including, but not limited to, tree planting, release, precommercial thinning, and site preparation and wildland firefighting.

(b) **Definitions**

"Migrant Agricultural Worker" and "Seasonal Agricultural Worker", as used in this clause, mean individuals employed in agricultural (including forestry) work on a seasonal or temporary basis. A worker who moves from one seasonal activity to another is employed on a seasonal basis even though he or she may continue to be employed during a major portion of the year. Migrant workers are required to be absent overnight from their permanent place of residence. Seasonal workers are not required to be absent overnight from their permanent place of residence. Members of the contractor's immediate family are not considered to be either

migrant or seasonal workers. "Immediate family" includes only 1) spouse; 2) children, stepchildren, or foster children; 3) parents, stepparents, or foster parents; and 4) brothers and sisters.

"Farm Labor Contractor", as used in this clause, means an individual who, for any money or other valuable consideration, paid or promised to be paid, performs any recruiting, soliciting, hiring, employing, furnishing, or transporting of any migrant or seasonal agricultural worker.

(c) **Registration Requirement**. Any contractor who provides or hires migrant or seasonal workers to perform agricultural or manual forestry work shall first obtain a Certificate of Registration from the Department of Labor or an authorized State agency. The contractor shall carry the Certificate at all times while engaged in contract performance, and shall display it upon request. Any of the contractor's employees who also perform any one or more of the farm labor contractor activities defined above must have their own Farm Labor Contractor Employee Certificate.

(d) **Worker Protections**. The contractor shall comply with the following protections and standards related to wage disclosure, recordkeeping, vehicle safety, and housing:

(1) The contractor shall display and maintain at the place of employment the MSPA poster provided by the Department of Labor.

(2) **Wage and Payroll Standards**

(i) The contractor shall disclose in writing to each worker in a language common to the worker the full terms of their employment, including workers compensation information, at the time they are recruited or hired. The Department of Labor provides an optional form WH-516 for contractor's use in disclosure.

(ii) The contractor must keep the following payroll records for each employee: name, address, social security number, basis for wages (i.e., per hour, per tree, per acre), number of units earned if paid on a per unit basis, hours worked, total pay, withholdings and purpose for each, and net pay. Payroll records shall be retained for three years.

(iii) Payments must be made no less frequently than every two weeks or semi-monthly. At the time of each payment, the contractor shall provide to the employee a written itemization of the information listed above and which shall include the employer's tax identification number.

(iv) If paid on a piece rate basis, the employee's wage must be at least equivalent to the required hourly wage for the hours worked, including overtime differential for time in excess of 40 hours per week.

(3) **Motor Vehicle Safety**

(i) The contractor must be registered to transport employees, unless employees provide their own transportation or carpool by their own arrangement in one of their own vehicles. The authorization to transport employees must appear on the contractor's certificate. If the contractor directs or requests employees to carpool, the registration requirement is still applicable. Any driver who transports workers for a fee or at the direction of the contractor must be registered as a farm labor contractor or a farm labor contractor employee.

(ii) Any vehicle under the ownership or control of the contractor shall comply with safety standards applicable to that vehicle. Generally passenger vehicles or station wagons must comply with Department of Labor regulations at 29 CFR 500.104. Vehicles other than passenger vehicles or station wagons which are driven more than 75 miles must comply with Department of Transportation Regulations at 29 CFR 500.105. All drivers must have a current, valid State drivers license.

(iii) Each vehicle under the ownership or control of the contractor which is used to transport any migrant or seasonal agricultural worker shall be covered by vehicle insurance of $100,000 per seat (maximum $5,000,000). A workers compensation policy which covers the workers while being transported plus an additional property damage policy for $50,000 for loss or damage in any one accident to the property of others may be substituted for the vehicle insurance requirement.

(4) **Housing**

(i) The contractor shall house workers only in a commercial establishment or a facility that has been certified by a health authority or other appropriate agency. The contractor must post the certificate of occupancy at the housing site.

(ii) The authorization to furnish housing, other than commercial lodging, must appear on the contractor's certificate.

(e) For further information on the requirements of the Act, contractors should contact their local Wage and Hour Division of the Department of Labor.

**MIGRANT AND SEASONAL AGRICULTURAL WORKER PROTECTION ACT REGISTRATION (FSAR 4G52.222-703) (DEC 1999)**

The Migrant and Seasonal Agricultural Worker Protection Act (MSPA)(29 USC 1801-1872) and implementing regulations issued by the Department of Labor (29 CFR 500), require any employer who hires or anticipates hiring employees subject to MSPA to obtain an MSPA registration number.

If the contractor employs or anticipates hiring employees subject to MSPA, the contractor shall provide a valid U.S. Department of Labor MSPA Registration Number to the Contracting Officer within **30** days after notification of award of the contract.

The Government may demand that the contractor display MSPA registration at any time during contract performance if it appears that the contractor is employing workers subject to MSPA. On demand, the contractor shall display its MSPA registration or state why it is exempt from MSPA.

Compliance with MSPA is a material condition of the contract. If the contractor fails to provide a valid MSPA number in accordance with this clause, or falsely states that it is exempt from the MSPA, the Government may terminate the contract, in addition to other remedies or penalties prescribed by law.

4100.00

133,025.00

-0-

4100.00

United States Department of Agriculture
Forest Service
Kootenai N.F.
1101 U.S. Highway 2 West
Libby, MT 59923

File Code: 6310

Date: 13 Oct 2003

Subject: Request for Quotations, Request No. 14-03-085
Rexford Ranger District Fuel Reduction Thinning

To: Bear Mt. Contracting
PO Box 150
Laclede ID 83841

Your quote of $33,025.00 in response to the subject Request for Quotations is accepted.

Enclosed is Purchase Order No. 43-03J1-4-0008. The order is an offer by the Government to you to buy the services described therein upon specified terms and conditions. Please review the order and its attachments. If you accept the Government's offer, please sign, date and return the acceptance copy of the Purchase Order to Dale Reckley.

Also enclosed is a copy of the Contracting Officer's Representative (COR) designation. Please contact Sheila Braun at the Rexford Ranger District, (406) 296-7164 to establish a date for the Prework Meeting.

**WORK SHALL NOT BE STARTED UNTIL YOU RECEIVE AN OFFICIAL WRITTEN NOTICE TO PROCEED.**

Jeanne M Robertson
JEANNE M. ROBERTSON
Contracting Officer

Enclosures

cc: COR S. Braun, D1
B&F
Contract File

UNITED STATES DEPARTMENT OF AGRICULTURE
PURCHASE ORDER

THIS NUMBER MUST APPEAR ON ALL INVOICES, PACKAGES,

| PAGE | CONTRACT NUMBER | ORDER DATE | | ORDER NUMBER | SUB |
|---|---|---|---|---|---|
| 1 OF 1 | | 14-OCT-2003 | | 43-03J1-4-0008 | |

| TYPE PURCHASE | VENDOR IDENTIFICATION NUMBER | FORM 1099 | TAXPAYER'S IDENT. NO. |
|---|---|---|---|
| PURCHASE ORDER | | Y | 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 |

TO:
BEAR MT CONTRACTING
PO BOX 1554

NEWPORT WA 99156

SHIP TO

CONSIGNEE
Kootenai NF, Rexford Ranger District

1299 Highway 93 North

Eureka MT 59917
PHONE: 406-296-2536 EXT:
FAX: EXT:

| LINE ITEM | ACT CODE | DESCRIPTION | QUANTITY | UNIT ISSUE | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| | | **VENDOR NOTES:** Rexford Ranger District Fuel Reduction Thinning | | | | |
| 01 | | 1 Black Butte - Selective tree thinning, removal of merchantable material, slashing, slash piling in unit | 1.000 | LS | $22,050.0000 | $22,050.00 |
| 02 | | 2 Othorp Lake - Selective tree thinning, slashing, slash piling in unit, hand piling on steep slopes | 1.000 | LS | $10,975.0000 | $10,975.00 |
| | | Offer Acceptance: By signing in the space indicated below, the contractor agrees to perform the work stated in this purchase order in accordance with the attached terms and conditions, and specifications of Request for Quotations 14-03-085. | | | | |

Signature Date

SELLER'S ORIGINAL

THIS PURCHASE ORDER NEGOTIATED PURSUANT TO AUTHORITY OF 41 U.S.C. 252(C) ( )

| FOB POINT | DISCOUNT AND/OR NET PAYMENT TERMS | | | | TOTAL |
|---|---|---|---|---|---|
| | DAYS | DAYS | DAYS | NET | |
| DESTINATION | | | | 30 | $33,025.00 |

| REQUIRED DELIVERY DATE | SHIP VIA |
|---|---|
| 31-JUL-2004 | |

DO NOT SHIP ORDER TO THIS ADDRESS (Ship to Consignee Address Above)

BILLING INSTRUCTIONS:
No Billing Will Be Submitted In Advance Of Shipment.
Furnish Invoice With Our ORDER NUMBER: **43-03J1-4-0008**
and your VENDOR IDENTIFICATION NUMBER:
VID **539402071 A** to:

PHONE: EXT:
FAX: EXT:

FAILURE TO SHOW OUR PURCHASE ORDER NUMBER (**43-03J1-4-0008**) AND YOUR VENDOR IDENTIFICATION NUMBER (VID **539402071 A** ) WILL DELAY PAYMENT.

FREIGHT CHARGE OVER $100 REQUIRES BILL OF LADING.

IF AVAILABLE, INCLUDE YOUR TAXPAYER IDENTIFICATION NUMBER ON EACH INVOICE.

**ISSUING OFFICE**
Kootenai National Forest
1101 US Hwy 2 West

Libby MT 59923
PHONE: 406-293-6211 EXT:
FAX: 406-283-7712 EXT:

ORDERED BY ( NAME AND TITLE)
Jeanne M. Robertson
Contracting Officer
PHONE: 406-293-6211 EXT: 7618
FAX: 406-283-7712 EXT:
AUTHORIZED SIGNATURE Jeanne M Robertson

PRINTED BY OPS$JVOTAPKA
PTS VERSION(08/1999)

SELLER'S ORIGINAL

United States Department of Agriculture | Forest Service | Kootenai N.F. | 1101 U.S. Highway 2 West
Libby, MT 59923

**File Code:** 6310 **Date:** 3 Mar 2004

**Subject:** Contract 43-03J1-4-0008
Rexford Ranger District Fuels Reduction Thinning

**To:** Bear Mountain Contracting
P.O. Box 1554
Newport WA 99156

In accordance with Federal Acquisition Regulation clause 52.242-14, Suspension of Work (Apr 1984), you are hereby directed to suspend all work on subject contract. You will be notified in writing when work is to procede.

for Dale R. Rechley
JEANNE M. ROBERTSON
Contracting Officer

cc: Contract Folder
COR, S. Braun

United States Department of Agriculture Forest Service Kootenai N.F. 1101 U.S. Highway 2 West Libby, MT 59923

File Code: 6310

Date: 6 Mar 2004

Subject: Contract 43-03J1-4-0008
Rexford Ranger District Fuels Reduction Thinning

To: Bear Mountain Contracting
P.O. Box 1554
Newport WA 99156

The Government must make changes to the specifications of subject contract regarding Line Item 1, Black Butte. The changes are as follows:

1. No timber may be removed from the Black Butte area of the contract. All downed timber shall remain where it is located. Timber already moved to the landing area shall not be hauled away.
2. The 44 acres that have already been slashed shall be piled.
3. The contractor shall submit in writing a new price for Line Item 1, Black Butte. The total price should include separate Sub-Item prices for hand piling and excavator piling existing slash.

No changes are made to Line Item 2, Orthrop Lake. Work may continue as specified in the original specifications for this area.

This letter supercedes previous Work Suspension letter dated 3 Mar 2004.

Questions should be addressed to Dale Reckley at 406-283-7644.

for Dale R. Reckley
JEANNE M. ROBERTSON
Contracting Officer

cc: Contract Folder
COR, S. Braun



EXHIBIT
D

United States Department of Agriculture
Forest Service
Kootenai N.F.
1101 U.S. Highway 2 West
Libby, MT 59923

**File Code:** 6310

**Date:** 6 Apr 2004

**Subject:** Contract 43-03J1-4-0008, Modification 001
Rexford Ranger District Fuel Reduction Thinning

**To:** Bear Mt. Contracting
PO Box 1554
Newport WA 99156-1554

Per our discussions at the meeting of April 6, 2004, I've enclosed a modification that terminates Item 1, Black Butte, of subject contract. Please sign, date, and return the original to the undersigned.

Work shall continue on Item 2, Othorp Lake, per the original contract specifications.

I will also be processing an invoice for $4,400.00 to cover the work performed to date at the Black Butte site and look forward to reviewing your information regarding the value of the salvage material at this site.

Dale R. Reckley
DALE R. RECKLEY
Contracting Officer

Enclosures

cc: COR S. Braun, D1
Contract File



EXHIBIT
E

6

**Bear Mountain Contracting**
P.O. Box 1554
Newport, WA. 99156-1554
(208) 265-5401 cell (509) 949-1511
*SITE PREP*ROAD BUILDING*EXCAVATING*

United State Department of Agriculture
Forest Service
Forest Supervisor, Bob Castaneda
Kootenai National Forest
1101 U.S. Highway 2 West
Libby, MT. 59923

April 26,2004

Dear Mr. Castenada,

This letter is in regard to a partial payment on contract, Purchase Order, # 43-031-4-0008, Kootenai National Forest, Rexford Ranger District. Date of issue was October 14, 2003. This contract was suspended on March 3,2004, by the Forest Service, and 44 acres of work had been completed. It was determined that contractor could not return to this work at that time and on March 13,2004 contractor request, in writing, payment for the amount of work accomplished.

On April 6, during a meeting between Forest Service employees and Bear Mountain Contracting, Ms. Basford asked Mr. Reckey about this payment and he said he didn't have to pay it until contract was complete. (Enclosed please find the agreement at the pre-work meeting) At that time Mr. Reckely agreed to pay as work was accomplished, but had said he did not have to do so. Then Ms. Basford explained to Mr. Reckley that this is making a hardship on the contractor and therefore she again requested that it be paid. At that time Mr. Reckley promised to take care of it and he would start it that day.

On April 23,2004 Bear Mountain receive a letter that the payment was being processed as of April 20, 2004. This makes this payment available about May 20, 2004, which makes it at lest a month and a half over due. So, will this payment be processed with interest? It is the Forest Services policy to add interest to a payment that is one month over due. Please let me know and please let me know when I will receive this payment. Thank you.

Regard,

Hubert Basford

cc
The Honorable Chief Judge Donald W. Molloy
Gale Norton
Dale Bosworth

EXHIBIT
tabbies
F

Cc continue:

Governor Judy Martz
Governor Dirk Kempthone
Governor Janet Napolitano
The Honorable Larry Craig
The Honorable Mike Crapo
The Honorable Max Baucus
The Honorable Conrad R. Burns
The Honorable Patty Murray
The Honorable Maria Cantwell
The Honorable Dennis Rehberg
The Honorable C.L. Otter
The Honorable Mike Simpson
Montana Environmental Information Center
The Land Council
National Forest Network
Defenders of Wildlife National Headquarters
Forest Service Limited Timber Sale Content Analysis Team
Tobacco Valley News
Missoulian
Montanan
Spokane Review
Keith Olsen
Cornelis F de Hoop
Jim Geisinger
Tom Woodburg

United States Department of Agriculture
Forest Service
Kootenai N.F.
1101 U.S. Highway 2 West
Libby, MT 59923

File Code: 6320

Date: 18 May 2004

Subject: Contract 43-03J1-4-0008
Rexford RD Fuel Reduction Thinning

To: Bear Mountain Contracting
P.O. Box 1554
Newport WA 99156

I am writing in response to your letter dated May 14, 2004 requesting additional time to complete subject contract. Your request for a contract extension is denied for two reasons: (1) despite my written direction to continue, you have refused to do any work since early March and (2) there is still sufficient time remaining to complete all work by the original contract end date of 31 Jul 2004.

Additionally, I still need substantiation of your assertion of the value of sawlogs and pulp. Please provide it as soon as possible.

Dale R. Reckley

DALE R. RECKLEY
Contracting Officer

cc: Contract Folder
COR



EXHIBIT
G

Recycled Paper

United States Department of Agriculture | Forest Service | Kootenai N.F. | 1101 U.S. Highway 2 W. Libby, MT 59923

File Code: 6310 Date: June 8, 2004

Subject: Contract No. 43-03J1-3-0008
Fuel Reduction

**To: Bear Mountain Contracting**

As a current contractor with the U.S. Forest Service, this letter is to inform you of a requirement to provide information regarding work you have completed, but not yet invoiced. This information is required to ensure that our financial statements are accurate.

Therefore, in accordance with the Prompt Payment and Payments clauses in your contract, please fill in the information requested at the bottom of this letter and return the letter to me by June 23, 2004.

We appreciate your compliance with this request, and value your continued business relationship. If you have any questions, or need additional information, please call me at (406) 283-7644.

Dale R Reckley
Contracting Officer

cc: Contract File
B&F

Please complete the following information and return to me in the envelope provided.

"Under contract number 43-03J1-3-0008 , as of the end of June 2004, I anticipate incurring the following estimated value of work for the project: $71,874.00.

Of this amount, $71,874.00 has been invoiced, and $71,874.00 has not been invoiced."

Dale R. Reckley
Signature

6/29/04

6/8/04
Date

EXHIBIT
H

Faxed - 6/28/04

21

**Bear Mountain Contracting**
P.O. Box 1554
Newport, WA. 99156-1554
(208) 265-5401 cell (509) 949-1511
*SITE PREP*ROAD BUILDING*EXCAVATING*

1

United State Department of Agriculture
Forest Service
Forest Supervisor, Bob Castaneda
Kootenai National Forest
1101 U.S. Highway 2 West
Libby, MT. 59923

July 6,2004

Dear Mr. Castaneda,

**Request for a new CO on said contract.**

This is a request for a new CO on the Black Butte Salvage contract 43-03J1-4-0008.

Referring to the letter enclosed please note that Mr. Reckely has not provided any provisions asked for by Bear Mountain to complete this contract as stated in previous letters. He states a clause of a fixed price contract? This is not a fixed price contract. The FS has changed everything but it being a fixed price contract? This contract can not be completed by anyone and therefore is illegal and has no fixed price. What are you people trying to do here? This contract would need to be change for any contractor.

Mr. Reckely states that it was bid at a price and has to be done at that price? The job is totally a different job at this point. It is less that half the price and all the salvage has been taken off of the contract. How can you support this?

I have asked for an extension and it is not being granted. Why not? This contract needs to be looked at further to determine if any contractor would even work on it at this price. Why are you letting this Mr. Reckley take such liberty's with a contractor. He has gone as far as contacting other Forest that we have worked on looking for other contracts we have failed at. This is slanderous. Why are you allowing this behavior?

I am requesting another CO in another district to work with me.

You may contact me at bearmtcont@hotmail.com, or Hubert Basford, PO Box 150, Laclede, ID. 83841, (208) 265-5401, Bear Mountain Contracting, PO Box 1554, Newport, WA. 99156, (509) 949-1511

Sincerely,

Roxanne Basford for Hubert Basford

Hubert Basford

EXHIBIT
tabbies
I

United States Department of Agriculture | Forest Service | Kootenai N.F. | 1101 U.S. Highway 2 West
Libby, MT 59923

**File Code:** 6320 **Date:** 26 Jul 2004

**Subject:** **Notice of Termination**

**To:** Bear Mountain Contracting
P.O. Box 1554
Newport WA 99156

In accordance with Federal Acquisition Regulation (FAR) clause 52.249-8, Default (Fixed-Price Supply and Service) (APR 1984), contract number 43-03J1-4-0008, dated 14 Oct 2003 is hereby terminated in its entirety. Despite direction from the Contracting Officer to continue work, Bear Mountain Contracting has not performed work under this contract since early March 2004 and so has failed to make progress as to endanger performance. The Forest service estimates that approximately six weeks worth of work remains. The remaining fuels reduction work cannot be completed by the contract end date of 31 Jul 2004. You also failed to respond with a plan to correct your inadequate performance after receiving the "Cure Notice" on 2 Jul 2004. Therefore, your right to proceed under this contract is terminated.

The terminated services may be purchased against your account. You will be held liable for any excess costs associated with reprocurement of the services required to be performed in accordance with this contract. The Government reserves all rights and remedies provided by law or under the contract, in addition to charging excess costs.

This notice constitutes the Contracting Officer's final decision that Bear Mountain Contracting is in default as specified and that your failure to perform is not excusable. This decision may be appealed to the Board of Contract Appeals, U.S. Department of Agriculture, Room 219, South Building, Washington, DC 20250-0600. If you decide to make such an appeal, you must furnish written notice thereof to the Board of Contract Appeals within 90 days of the date that you receive this decision. A copy thereof shall be furnished to the Contracting Officer, Kootenai National Forest, 1101 Highway 2 West, Libby, MT 59923, from whose decision the appeal was taken. Your notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number.

With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision

It is the Forest Service's goal to negotiate a reasonable settlement for the value of the salvage on the Black Butte portion of this contract. If you wish to participate in this negotiation process you must submit a written settlement proposal to the undersigned by 20 Aug 2004. Your proposal must contain sufficient detail, rationale, and substantiation to allow the Contracting Officer to determine how your proposed timber volumes and prices were established. If you choose not to submit a settlement proposal, the Contracting Officer will issue a final decision based solely on the Forest Service's calculations of the salvage value. You have the burden of establishing, by proof satisfactory to the Contracting Officer, that the proposed amount is accurate and correct.

Dale R. Reckley
DALE R. RECKLEY
Contracting Officer
406-293-6211

cc: Contract Folder
COR
B&F
SBA

EXHIBIT
tabbies
J



Printed on Recycled Paper

United States Department of Agriculture
Forest Service
Kootenai N.F.
1101 U.S. Highway 2 West
Libby, MT 59923

File Code: 6320

Date: 30 Aug 2004

Subject: Contract 43-03J1-4-0008
Rexford RD Fuel Reduction Thinning
Reinstatement of Contract

To: Bear Mountain Contracting
c/o Sullivan, Tabaracci & Rhoades
Attn: Andrew W. Pierce

Federal Acquisition Regulation subpart 49.401(e) states: "…the contracting officer may, with the written consent of the contractor, reinstate the terminated contract by amending the notice of termination…".

The USDA Forest Service is offering to reinstate subject contract under the original terms and conditions. Bear Mountain Contracting must agree to complete all work to include handpiling of slash where machine piling is not possible due to steep or rocky terrain. This was a requirement of the original contract and it will remain in effect in the reinstated contract. There is no advantage to the Government in reinstating the contract if Bear Mountain Contracting is going to refuse to meet their contractual obligation again.

As always the Kootenai National Forest is willing to work with you as unforseen problems arise in the administration of this contract. We will not, however, agree to accept less then we contracted for.

If you would like to reinstate the contract, please submit your written consent to me by close of business on 31 Aug 2004.

Dale R. Reckley

DALE R. RECKLEY
Contracting Officer

cc: Contract Folder
COR

EXHIBIT
tabbies
K



(1)

Printed on Recycled Paper

**SULLIVAN
TABARACCI
& RHOADES**
A Professional Corporation
*Attorneys at Law*

Zane K. Sullivan
John K. Tabaracci
Quentin M. Rhoades
D. Scott Manning
* Darrel L. Moss
‡ Sarah J. Rhoades
Carolynn M. Fagan
♯ Chris A. Johnson
Angela Zielinski
♮ Andrew Pierce

*Also licensed in Colorado
‡Registered in US Patent & Trademark Office
♯ Also licensed in Washington
♮ Also licensed in Wyoming

August 31, 2004

Dale Reckley
Contracting Officer
U.S. Department of Agriculture
Forest Service
1101 U.S. Highway 2 West
Libby, MT 59923

***Re: Bear Mountain Contracting Settlement Proposal***

Dear Mr. Reckley:

We write today in reference to your Notice of Termination dated July 26, 2004 to Bear Mountain Contracting of Newport, Washington, ("Bear Mountain") regarding the Orthorp Lake / Black Butte Fuels Reduction and Thinning Contract ("the Contract"). Your Notice indicates the USDA Forest Service's ("USFS") goal is to negotiate a reasonable settlement for the value of the salvage on the Black Butte portion of the Contract ("Black Butte"). The Notice also indicates that if Bear Mountain wishes to participate in this negotiation process, it must submit a written settlement proposal to you.

Initially, the deadline for this proposal was August 20, 2004. You then agreed upon our request to an extension for this proposal until August 31, 2004. We do note that your deadline for a settlement proposal appears contrary to the terms of USFS Contract with Bear Mountain. The inserted Contract Clause 52.233-1, Disputes (d)(1), provides that a Contractor may make a claim within 6 years after accrual of the claim. Bear Mountain reserves its rights under that and all other provisions of the Contract and under applicable law.



EXHIBIT
tabbies
L

This letter shall serve as Bear Mountain's written settlement proposal regarding payment for the completed work on the Black Butte portion of the Contract. As you will recall, the background leading up to this negotiation is as follows:

- On June 27, 2003, Federal District Judge Donald Molloy issued his Order enjoining USFS from "further timber sales only pending the resolution of these matters on remand."

- On October 13, 2003, USFS issued the contract at issue to the Basfords / Bear Mountain Contracting covering the Orthorp Lake, Bear Mountain areas within the Pinkman drainage.

- On March 3, 2004, after Basfords had begun to perform under the contract, USFS suspended the Basford's work with no explanation.

- On March 6, 2004, USFS superceded the Work Suspension letter of March 3, 2004, and directed Bear Mountain Contracting to continue work with significant changes to the Black Butte portion of the Contract.

- On April 6, 2004, you directed Bear Mountain to continue work on Orthorp Lake portion of the Contract.

- On May 6, 2004, USFS admits making a "mistake" in including larger trees (greater than 7" dbh) and pulp in the salvage rights portion of the Black Butte Contract. USFS contends the Contract remains in place with extensive changes to the work required of Bear Mountain, but refuses to make a corresponding increase in the price of the Contract. These changes by USFS result in the Contract becoming unprofitable to Bear Mountain.

- On May 18, 2004, USFS denies Bear Mountain's request for additional time to complete the Contract on the grounds that 1) it has refused to do any work since early March, despite CO requests, and 2) there remains sufficient time to complete all work by the original contract date of July 31, 2004.

- On July 26, 2004, USFS terminates the Contract in its entirety citing Bear Mountain's "failure to perform" on the Contract since March, 2004. The Notice of Termination makes no reference to USFS's unilateral change of material conditions of the Contract.

- On August 20, 2004, Judge Molloy lifts the injunction on the Kootenai National Forest, including the Pinkman drainage.

USFS has offered to pay Bear Mountain the amount of $781.08 for the work they have completed on the Black Butte portion of the Contract. According to USFS, on March 26, 2004, Justin Burkey and Mark Rebella estimated the volume of timber cut and not removed on Item 1 (Black Butte portion) of the Orthorp Lake Fuel Reduction Thinning project. The Forest made three estimations of volume: 1) merchantable timber felled, bucked, skidded and in deck; 2) merchantable timber felled but not skidded; 3) merchantable timber not cut but intended to be cut by the Basfords around Ponderosa Pine greater than 14" DBH. USFS used delivered log prices to get a predicted high bid of $85.05/ccf. It then "backed out" felling and bucking charges of $21.78/ccf according to its appraisal program, bringing the value to $63.27/ccf. It estimated total market value of the 12.44 ccf at $787.08.

Bear Mountain disputes this calculation. Bear Mountain contends USFS's appraisal of the existing deck of logs is based on prices which would be obtained as a high bid if this Contract were sold to the highest bidder in a timber sale, and not the more appropriate price the service contractor would receive at a mill. Bear Mountain contends the price at the mill would be $400.00 MBF, not USFS predicted high bid of $85.05ccf. Bear Mountain had contracts in place with the mills to verify this figure.

Bear Mountain also disputes USFS's "backing out" of felling and bucking charges of $21.78. Bear Mountain believes this amount would only apply to a timber sale and not to this "salvage" contract. It also contends USFS's deduction of 13% for defect is improper because a defect deduction is only properly applied to a timber sale and not to a salvage contract which includes all merchantable timber "down to the boughs."

Bear Mountain has retained Forestry and Natural Resources Consultant, Dan Pittman, CF/ACF, of Forest Resources of Montana & Associates, LLC to assist it in presenting this settlement offer. Mr. Pittman has reviewed USFS's and Bear Mountain's positions in this matter. It is his opinion that the USFS should compensate Bear Mountain for the delivered log prices for both sawlogs and pulp, rather than the "high bid" prices with deductions for "felling and bucking" and for "defect" as proposed by USFS.

Mr. Pittman's calculations apply to the three distinct portions of the Black Butte portion of the Contract also addressed by USFS: 1) merchantable timber felled, bucked, skidded and in deck; 2) merchantable timber felled but not skidded; 3) merchantable timber not cut but intended to be cut by the Basfords. Based on Mr. Pittman's calculations, the compensation to Bear Mountain for the item 1) above is as follows:

///

**Sawlogs (felled, bucked, skidded and in deck):**

4.33 MBF (estimated volume in log deck, as determined by USFS)
x $ 400.00 (delivered log price, per contract with Owens & Hurst Lumber Co.)
**$ 1,732.00 value of sawlogs in deck**

**Pulp Logs (for same area as Sawlogs felled, bucked, skidded and in deck):**

USFS estimate of area completed for the merchantable timber felled, bucked, skidded and in deck = 2-3 Acres (**Note: 2.5 acres** used for calculations).

**2.5** completed acres = ½ load of pulp (1 load pulp per 5 acres)
= **12 Tons pulp** (1 Load of pulp weighs 24 Tons/ Self-Loader)
x $ 30.00 per Ton (contract with Old Town Log Yard)
**$ 360.00 value of pulp on 2.5 completed acres**

**SubTotal $2,092.00**

**Merchantable timber, felled but not skidded:**

By USFS calculations, Bear Mountain felled, but did not skid, merchantable timber on 44 acres. Bear Mountain was paid $4,400.00 for the felling portion of this work. The value of the merchantable material on the 44 acres may be calculated based on the formulas applied to the 2.5 completed acres.

**Sawlogs felled but not skidded:**

2.165 MBF/acre (4.33 MBF estimated volume in log deck for 2 acres)
x 44 acres
95.260 MBF
x $400.00 delivered log price
**$38,104.00 value of merchantable saw logs (delivered price) on 44 acres**

Pulp Logs on 44 acres (1 load per 5 acres) = 8.8 loads
24 Tons per self-loader x 8.8 loads = 211.20 Tons Pulp
x $30.00 per Ton Pulp delivered price by contract
= **$6,336.00 value of pulp logs on 44 acres, delivered price**

A copy of Mr. Pittman's opinion letter, including his calculations, is attached for your review.

To negotiate the settlement of this Contract, Bear Mountain has been forced to incur additional costs in the form of attorney fees and consultant fees, in the amount of $5,300.00. Those costs will necessarily increase the longer this matter remains unresolved. USFS's Contract with Bear Mountain provides for such fees to be paid to the contractor in this situation. "If the CO and Contractor fail to agree on the whole amount of costs to be paid because of the termination of work, the CO shall determine, on the basis of information available, the amount, if any, due the Contractor, and shall pay the amount, determined as follows: . . . The reasonable costs of settlement of the work terminated, including– (i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data." (52.249-11 (g)(3)(i) Termination of Work (Consolidated Facilities or Facilities Acquisition)).

The total amount requested by Bear Mountain for completed work and value of merchantable materials to which they would have been entitled on the Black Butte portion of the Contract, plus reasonable associated costs reasonably necessary for the preparation of this termination settlement proposal, is $51,832.00. This, of course, does **not** include amounts to which Bear Mountain would have been entitled had it been permitted to work through completion of the Contract.

Finally, and most important, Bear Mountain contract insists that any amicable resolution must include USFS's rescission of Bear Mountain's default under the contract. The decision by USFS will have a substantial impact on Bear Mountain's economic viability as a company. In order for USFS to settle these claims, and to keep its efforts athwart an injunction of a U.S. District Court from becoming an issue for litigation, the default must be rescinded or otherwise voided. Absent that condition, Bear Mountain will have no choice but to resort to its remedies in court.

Thank you for you kind attention. Please convey this offer to the appropriate USFS decision makers at your earliest convenience. Should we not hear from you to the contrary within ten days, this offer will be automatically revoked without further notice, and we will advise our client to proceed accordingly.

Very truly yours,
SULLIVAN, TABARACCI & RHOADES

Quentin M. Rhoades
QR:ccn
Enclosure: Pittman's report
G:\WPUNIX\Clients\B\Basford, Roxanne & Hubert - 5520-00100\Correspondence\Reckley Settlement ltr.8-31-04 Q.wpd

# Forest Resources of Montana & Associates, LLC

**Dan Pittman, CF/ACF**
*Forestry and Natural Resource Consultant*

August 30, 2004

Mr. Andrew Pierce
Sullivan, Tabaracci & Rhoades, PC
1821 South Avenue West
Missoula, MT 59801

Re: Hubert Basford d.b.a. Bear Mountain Contracting vs. Forest Service

Dear Andrew:

This letter will serve as documentation of my review and research regarding the dispute between Mr. Hubert Basford, d.b.a. Bear Mountain Contracting and the U.S. Forest Service, in regards to the Black Butte/Orthrop Lake Thinning Contract.

I visited with Mr. Basford on the phone yesterday regarding the dispute. To begin with I would like to point out that Mr. Basford is a graduate forester who has previously worked for the Forest Service as a Silviculturlist for ten years before establishing his own business as an independent contractor. He has been an independent contractor for the past 23 years and has completed 107 contracts with the Forest Service in this time. It should also be noted that the definition of Silviculture, as it is defined in The Dictionary of Forestry, is: the art and science of controlling the establishment, growth, composition, health, and quality of forests and woodlands to meet the diverse needs and values of landowners and society on a sustainable basis. It is my opinion Mr. Basford is knowledgeable and highly qualified in the forestry field, capable of implementing silvicultural prescriptions.

In reviewing the file and visiting with Mr. Basford it is my understanding that he signed a Purchase Order (PO) agreement, order number 43-03J1-4-008, which involved two fuel reduction/thinning projects. The first being, Black Butte and the second being Othorp Lake located on the Rexford Ranger District, Kootenai National Forest. The dispute involves the Black Butte portion of the contract where Mr. Basford began his work and was immediately stopped and eventually defaulted by the Forest Service. It appears that Mr. Basford was to selectively thin trees, remove merchantable material, slash the non-commercial material and pile it for the Forest Service to burn at a later date. The general scope of the contract calls for opening the overstory canopy through tree thinning as stated in the Silvicultural Prescription. It also allows the contractor salvage rights for a wide variety of products including but not limited to boughs, small Christmas trees, round wood (pulp) and as Mr. Basford has pointed out sawlog size material according to the prescription. It is this issue that is in dispute and is of some confusion as described in the contract. The Prescribed Treatment calls for "Commercial

Thinning" and is stated that he is to: "reduce stocking by thinning from below to an average of 60-80 ft2/acre. Vigor of the larger Ponderosa pine (PP) is to be maintained or improved by reducing competition for light, water and crown spacer. To achieve this objective use the following specifications:

- Harvest/slash all stems in unit less than 8" Diameter @ Breast Height (DBH)
- Leave all PP and Western Larch (WL) 14" DBH and larger
  - For a radius of 20 feet (outside bark) from each 14" DBH + PP or WL, harvest all stems except 14" DBH+ PP and WL.
  - In areas where leaving the trees above would not result in at least 70 trees/acre, leave the larger most vigorous trees up to 70 trees/acre, giving WL and PP a priority over Douglas fir (DF), but giving size and vigor criteria a higher precedence than species preference.
- Leave 2-4 sound snags over 10" DBH where available
- Leave all other stems over 8" DBH

Mr. Basford contends that the Forests Service directed him to space those trees greater than 14" DBH to 25 x 25 foot spacing. It should be noted that this spacing results in leaving 70 trees/acre, the number of trees required to be left in the above mention prescription.

The dispute evolves when Mr. Basford begins to fell, buck, and deck trees at a central landing. He falls trees on 44 acres and skids approximately 2-3 acres of sawlog size trees into a deck. This volume of which is 4.33 MBF or 9.98 CCF as estimated by the Forest Service. Mr. Basford has agreed with those numbers. It was at this point that Mr. Basford says the Forest Service tried to modify the contract in regards to the value of the work completed. Mr. Basford does not agree with these calculations

The Forest Service calculations of value are as follows:

A. In calculating the value of Basford's completed work, the Forest Service has applied the "high bid" amount of $85.05/CCF, minus "felling and bucking" charges of $21.78/CCF, lowering the value to $63.27/CCF.
B. The Forest Service also deducted 13% from the value of these sawlogs for "defect". They estimated total market value of the 12.44 CCF in the deck at $787.08.
C. The Forest Service never gave Basford's any credit for other "merchantable material" or "round wood"/pulp.
D. The Forest Service never gave Basford's any credit for the work he did on the remaining 44 acres, trees that were cut but not skidded to the deck.

Mr. Basford's calculations of value for the contract was based on slashing non-commercial material, piling it and his profit margin was to come from the commercial thinning value based on the local mill delivered log price, plus all other merchantable material.

A. Basford's agree with the Forest Service estimate that 2-3 acres had been cut and skidded to the landing area and put in the deck.
B. Basford's agree with the total volume in the deck, but disagree with how the Forest Service calculated the value of this work.

C. Basford's had a contract with Owens & Hurst Lumber Co. for $400/MBF for delivered sawlogs.
D. Basford's had a contract with Old Town Log Yard for $30.00 per ton for delivered pulp or $180/MBF (Hubert says one load of pulp per 5 acres).
E. Basford's DO NOT agree with a deduction for felling and bucking.
F. Basford's DO NOT agree with a 13% deduction for defect.
G. Mr. Basford wants to be paid for the delivered price of the logs, plus all the other merchantable material, down to the boughs, including pulp, without backing out of felling and bucking charges, without calculation for defect, and plus work slashing and felling done on the remaining 44 acres, but not skidded to the landing.

In my opinion the Forest Service failed to write a silvicultral prescription with supporting contractual clauses that clarified the removal of sawlog size material in the commercial thinning portion of the contract. Instead of being paid the $63.27/CCF proposed by the Forest Service for the sawlogs cut and decked, Mr. Basford should be paid the deliver log prices for both sawlogs and pulp on the entire contract. I am estimating the values to be:

- **Sawlogs $84,864** = $400 delivered log price x 212.17 MBF
  212.17 MBF = 98 acres x 2.165 MBF/acre
  2.165 MBF/acre = 4.33MBF (estimated volume in log deck) divided by 2 acres

- **Pulp Logs $14,400** = $30/Ton delivered price x 480 Tons
  480 Tons = 24 Tons/self loader x 20 loads
  20 loads = 98 acres divide by 1 load pulp/5 acres

**- TOTAL AMOUNT DUE = $99,264.00**

The Forest Service tried to modify the contract by telling Mr. Basford that he was not to cut any trees lager than 7" DBH and hand pile the slash instead of using an excavator. In my opinion this dramatically changes the scope of the contract and basis for which Mr. Basford calculated his bid price. Mr. Basford was suspended by the Forest Service with no explanation and eventually defaulted on the contract. Mr. Basford was never given a change order on the contract nor did he sign a modified contract.

It should also be noted that the Forest Service issued Mr. Basford this contract on October 13, 2003 but previously on June 27, 2003 Federal Judge Donald Molloy had issued an Order enjoining the Forest Service from "further timber sales only pending the resolution of these matters on remand."

If you have any question, please feel free to give me a call.

Sincerely,

Dan Pittman, CF/ACF

United States Department of Agriculture | Forest Service | Kootenai N.F. | 1101 U.S. Highway 2 West
Libby, MT 59923

**File Code:** 6320 **Date:** 9 Sep 2004

**Subject:** Contract 43-03J1-4-0008
Rexford RD Fuel Reduction Thinning

Copy Sent To Client 9/9/04

**To:** Bear Mountain Contracting
c/o Sullivan, Tabaracci & Rhoades
Attn: Andrew W. Pierce

I write this letter in response to your settlement proposal of 31 Aug 2004. As I compared your proposed timber volumes and prices to those of the Forest Service, it became clear to me that there is no way to negotiate our way across the gap that separates us. It's just too big. I would like to propose two possible alternatives.

**Alternative One: Reinstatement of the original contract.**

I continue to believe that this is a win-win alternative and the one the Forest Service would like to see implemented. If the Basfords believe, as they claim, that the 98 acres on Black Butte truly has close to $100,000 worth of sawlogs and pulp, then they stand to make over $124,000 for 6 weeks of work. The price of timber has increased approximately 30% in the last year so anything they thought they could make one year ago when they submitted their original quote, should have increased correspondingly.

We also believe that the likelihood of another injunction that would shutdown the operation is very small. Even if the Ecology Center appeals the judge's ruling, the chances that it would be effective before the work could be completed is, again, very small. Keep in mind that the injunction had nothing to do with the Othorp Lake portion of the contract. If the Basfords started immediately on Black Butte, they should be finished within a month and then could move to Othorp Lake which is at a lower elevation and more amenable to winter work.

If the Basfords consider this a viable alternative, they need to respond to me with a written consent to reinstate the original contract. Because of the impending end of the Government fiscal year, the written response must be received by 13 Sep 2004. Facsimile copies are acceptable.

**Alternative Two: Convert the settlement proposal to a claim under the Disputes Clause of the contract.**

This alternative allows the process to be streamlined and ultimately drawn to conclusion more quickly. The process as it stands now is:

1. the Contracting Officer makes a final decision on the settlement proposal.
2. the Basfords submit a claim if they take exception to the settlement proposal decision,

3. the CO issues a final decision regarding the claim and then,
4. if the Basfords disagree with the CO's decision on the claim, they may file an appeal.

This is a lengthy process and could be shortened by converting the settlement proposal to a claim and eliminating steps 1 and 2. If the Basfords choose this alternative, they must request, in writing, that the settlement proposal be converted to a claim and handled as such.

I encourage you to seriously consider Alternative One as the best possible solution on many levels. I look forward to your timely response.

Dale R. Reckley

DALE R. RECKLEY
Contracting Officer

cc: Contract Folder
COR

FOREST SERVICE U S DEPARTMENT OF AGRICULTURE

Kootenai National Forest
Contracting Office
1101 US Highway 2 West
Libby, MT 59923
Phone 406-293-6211
Fax 406-283-7712

KOOTENAI NATIONAL FOREST

Number of pages including cover page: 3

Date: 9/9/04

To: Andrew Pierce

From:

Fax #: 721-5838

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ For Your Information

Subject: Bear Mt.

Message: Andrew,

Please find attached a copy of proposed alternatives as discussed this morning on the phone.

Dale Reckley

United States Department of Agriculture | Forest Service | Kootenai N.F. | 1101 U.S. Highway 2 West Libby, MT 59923

**File Code:** 6320 **Date:** September 24, 2004

**Subject:** **Final Decision on Salvage Value**
Contract No. 43-03J1-4-0008

**To:** Bear Mountain Contracting
P.O. Box 1554
Newport WA 99156

**Background**

On October 14, 2003, Bear Mountain Contracting was awarded a firm fixed price contract No. 43-03J1-4-0008, for fuels reduction, thinning, slashing, and piling on the Rexford Ranger District of the Kootenai National Forest. The work areas under this contract were located at Othorp Lake and Black Butte. The contract completion date was July 31, 2004.

A temporary Suspend Work Order was issued on March 3, 2004 on the Black Butte portion of this contract pending assessment by the General Counsel on whether removal of sawlogs was in compliance with District Judge Molloy's injunction against timber sales in the Pinkham area of the Kootenai NF, which included Black Butte. Othorp Lake was not located in an area under question. At the time of the Suspend Work Order, Bear Mountain Contracting had slashed 44 acres of the 98 acres on Black Butte.

On March 6, 2004, the Contracting Officer (CO) notified Bear Mountain Contracting that the contract had been modified to reduce the scope of work at Black Butte. The CO rescinded the Suspend Work Order.

On April 6, 2004, the CO, the Contracting Officer's Representative (COR), Sheila Braun, and Bear Mountain Contracting met at the Supervisor's Office in Libby, Montana to discuss the value of the salvage on Black Butte affected by the reduction in scope. Mr. Basford (Bear Mountain Contracting) did not agree with the Forest Service data and value estimates, but did not provide information to counter the estimates. When Bear Mountain Contracting finally provided their estimate of salvage value, they did not provide requested substantiation or rationale for this value to the CO.

In a letter to the CO, dated June 29, 2004, Bear Mountain Contracting claimed the monies due them for the loss of timber product was $71,874.00. Bear Mountain did not provide any substantiation for this total. On August 31, 2004, the CO received a letter from Bear Mountain, through their lawyer, claiming $46,532.00. Once again, no substantiation of the claim in the form of sales contracts with local mills or timber cruise data was provided.

**Discussion**

The entire contract was terminated for default on July 20, 2004. Even though work was not completed on either of the two areas under contract, only Line Item 1, Black Butte, is in dispute. Bear Mountain Contracting claims they should be compensated for the value of the pulp and sawlogs on 44 of 98 acres





| | |
|---|---|
| Logging cost (skidding, loading, hauling 170 miles) | $13,972.00 |
| Value at $30/ton | 6,690.00 |
| Total value of pulp | $ -7,282.00 |

**Conclusion**

Bear Mountain Contracting based their volume estimates on guesswork and invalid assumptions of timber uniformity and distribution of trees. The Forest Service cruised the entire 44 acres and has data to support all of its estimates. Bear Mountain produced no substantiation of their estimates of pulp and sawlog values beyond assertions that they had contracts to purchase the timber products at mills. The Forest Service used standard estimating models supported by university studies and regional appraisal systems. Bear Mountain contracting failed to include the costs of hauling the pulp 170 miles to a mill in Idaho. The Forest Service accounted for this large aspect of cost and came to a vastly different conclusion on the value of pulp.

EXHIBIT II

that they slashed on Black Butte. The Forest Service does not dispute that they are entitled to fair compensation; the only disagreement is how much is fair. The crux of the disagreement centers on the methods used to estimate the volume and value of pulp and saw timber. Bear Mountain asserts it is entitled to delivered log prices without a deduction for logging and haul costs. The Forest Service counters that predicted high bid is a better meassure of value.

**Volume of Sawlogs**

Bear Mountain used the values from the 2-3 acres from which the sawlogs were skidded (2.5 used for ease of estimating) and applied those numbers to the remaining 41.5 acres, "calculating" a volume of 99.59 MBF. This method of estimating assumes a uniform distribution of timber across the entire 44 acres. This assumption is completely erroneous and has the effect of negating their entire argument of volume and thus, value.

The Forest Service established volume estimates by cruising the standing timber on the entire 44 acres. The cruise yielded a volume estimate of 23 MBF and breaks down as follows:

16.9 MBF from cruise + 4.7 MBF in deck + 1.4 MBF felled, not skidded = 23 MBF total on 44 acres

**Volume of Pulp**

Bear Mountain Contracting claims 1 load of pulp per 5 acres for a total of 223.2 tons. This is based solely on Mr. Basford's experience and guess. Again, the estimates are based on invalid assumptions of uniformity and consistency not found on the Black Butte project site. The Forest Service did not cruise the pulp but in the opinion of the Forest Service employees that walked the entire 44 acres, Bear Mountain's claims were not accurate. The Forest Service employees, based on their observations of inconsistent log lengths and the haphazard manner in which the "pulp" was felled on the 2-3 acres, felt that it would be impossible to remove it in an economically viable manner.

**Value of Sawlogs**

Bear Mountain contends that they should be paid delivered log price for sawlogs in accordance with the contract they had with Owens & Hurst Lumber Co. Despite repeated requests, Bear Mountain has refused to provide a copy of the log purchase contract so I have been unable to verify their claim of a signed delivery contract. They claim the sawlogs are valued at $39,836 based on a $400 delivered log price and 99.59 MBF. They also take exception to a reduction for felling and bucking.

The Forest Service used predicted high bid as a more accurate estimate of the value of the timber. Predicted high bid is a composite figure that takes multiple factors into account and reflects an overall value of the timber at time of sale based on prevailing market conditions. The predicted high bid at the time Mr. Basford would have signed his contracts to purchase sawlogs was $169.39/MBF. To account for the fact that he was already required, and being paid, under the terms of the service contract to fell and buck the logs for slashing and piling, the Forest Service reduced the predicted high bid by $46.40/MBF (calculated from residual value & logging cost). Thus the calculated value of the sawlogs is:

Predicted high bid $169.39/MBF - $46.40 (felling/bucking) = $122.99 x 23 MBF = $2,828.77

salvage. Bear Mountain twice declined the offer for reasons unknown.)

Bear Mountain Contracting's assertions of timber values are not supported. Given the lack of any type of significant substantiation provided by Bear Mountain for this claim, I am basing my final decision on Forest Service data. This data supports a value of $2,828.77 for sawlogs on the 44 acres and in the log deck. These monies will be held in account pending determination of excess costs associated with reprocurement of services. The Government reserves all rights and remedies provided by law or under the contract, in addition to charging excess costs.

This is the final decision of the Contracting Officer. This decision may be appealed to the Board of Contract Appeals, U.S. Department of Agriculture, Room 219, South Building, Washington, DC 20250-0600. If you decide to make such an appeal, you must furnish written notice thereof to the Board of Contract Appeals within 90 days of the date that you receive this decision. A copy thereof shall be furnished to the Contracting Officer, Kootenai National Forest, 1101 Highway 2 West, Libby, MT 59923, from whose decision the appeal was taken. Your notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number. In lieu of appealing to the Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims, 717 Madison Place NW, Room 103, Washington, DC 20005, within 12 months of the date that you receive this decision.

If you appeal to the Board of Contract Appeals, you may proceed under the Board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less.

Dale R. Reckley

DALE R. RECKLEY
Contracting Officer

cc: Contract Folder
COR
SBA

**Bear Mountain Contracting**
P.O. Box 1554
Newport, WA 99156-1554
(208) 265-5401 cell (509) 949-1511
*SITE PREP*ROAD BUILDING*EXCAVATING*

1

# Fax Cover Sheet

SCANNED

To: Mr. Rhoades

Sullivan, Tabaracci & Rhoades
Attorneys at Law
1821 South Avenue West, 3rd Floor
Missoula, MT 59801

Date: September 29,2004

Any questions please call. 208 265-5401

Pages 5

406-721-5838

Thank you,

Hubert and Roxanne Basford

Dear Drew,

We receive the copy of your letter to Mr. Reckely. Dated Sept 23. This fax has the certified copy of Mr. Reckley's responds. Would you like me to send him a letter stating that all correspondence should go through your office? Or as this letter indicated he is though with us and we need to move to the next level?

Rox

Refax Oct 4-04